*In re* ESTATE OF DAMION F. WADMAN, a Minor.—(Charles Robert Crail *et al.*, Guardians of the Person and Estate of Damion F. Wadman, a Minor, Petitioners-Appellants, *v.* Kirsten York, Respondent-Appellee.)

Fourth District   No. 4—82—0232

Opinion filed November 17, 1982.

TRAPP, J., concurring in part and dissenting in part.

Burger, Fombelle, Wheeler & Dvorak, P.C., of Decatur (James E. Zachry, of counsel), for appellants.

Wayne G. Hedenschoug, of Land of Lincoln Legal Assistance Foundation, Inc., of Springfield, for appellee.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

In this case we face again the difficult problems arising in proceedings where natural parents seek to have returned to them the rights and responsibilities previously placed in others by court order. On June 3, 1980, pursuant to the petition of Charles R. and Mary A. Crail under section 11—5 of the Probate Act of 1975 (Ill. Rev. Stat. 1979, ch. 110½, par. 11—5), the circuit court of Macon County entered an order appointing petitioners guardians of the estate and person of Damion F. Wadman, then a four-year-old boy. Respondent, Kirsten York, the natural mother, and apparently, sole person claiming parental rights, had filed a written consent to entry of the order. On April 15, 1982, pursuant to the request of respondent York, the court entered an order terminating the guardianship and returning the child to her custody.

Petitioners have appealed raising issues concerning (1) the standards the court should have applied in making its ruling, and (2) whether the ruling was contrary to the manifest weight of the evidence. More particularly petitioners assert: (1) the guardianship should not have been terminated absent a showing of change in circumstances since entry of the order appointing the guardians; (2) the trial court should have followed the detailed guidelines set forth in section 610 of the Illinois Marriage and Dissolution of Marriage Act

(Ill. Rev. Stat. 1981, ch. 40, par. 610); (3) the termination was not proved to be in the best interests of the child; and (4) the respondent mother was shown to be unfit.

In determining the standards applicable to the court's decision, we must first examine the statute under which the proceeding was brought. The only reference in the Probate Act of 1975 to the termination of the guardianship of a minor is section 11—14.1, which states, "[u]pon the minor reaching the age of majority, the letters of office shall be revoked and the guardianship shall be terminated." (Ill Rev Stat. 1979, ch. 110½, par. 11—14.1.) The Act makes no express reference to the termination of the guardianship of a minor who has not reached the age of majority. The parties have proceeded on a theory that section 23—2 of the Act (Ill. Rev. Stat. 1979, ch. 110½, par. 23—2) providing for removal of a "representative" covers the termination of a guardianship of a minor who has not reached the age of majority. A guardian is a "representative" within the definition used in the Act. Ill. Rev. Stat. 1981, ch. 110½, par. 1—2.15.

Section 23—2 is divided into subsections (a) and (b). Subsection (b) concerns removal of certain representatives if they become nonresidents and is not applicable here. Subsection (a) is geared primarily to removal of the representative for misconduct or inability to serve but also provides in subsection (a)(10) for removal for "other good cause." (Ill. Rev. Stat. 1979, ch. 110½, par. 23—2(a)(10).) Although few cases have touched on the applicability of section 23—2(a)(10) to proceedings of the nature here, in the case of *In re Estate of Brown* (1982), 103 Ill. App. 3d 470, 431 N.E.2d 457, the Appellate Court for the Fifth District indicated, by way of dictum, that section 23—2 would be applicable to proceedings to terminate the guardianship of a minor and to return the minor to parental custody. However, the court held that the "good cause" provision of subsection (a)(10) referred only to cause arising from malfeasance by or inability of the representative.

■ We agree that section 23—2(a)(10) is applicable to the termination of a guardianship of a minor prior to the minor's reaching majority. Otherwise there would be no way to terminate a guardianship in such a situation. We do not agree that "other good cause" includes only situations where the representative has committed malfeasance. If that were so, no procedure would exist to return a child to the custody and control of a parent when that parent had become an able and proper person to make the parental decisions for a child, but the previously appointed guardian had served properly and continued to be able to do so. Accordingly, we hold that section 23—2(a)(10) was properly invoked here even though the major thrust of the mother's

contentions before the trial court in seeking termination made no claim of any malfeasance or inability of the guardians but referred to her right as a parent to care for the child and her ability to do so.

■ As the Probate Act of 1975 sets forth no standards for the proceeding for termination involved here, we must look elsewhere for such standards. However, the supreme court has spoken recently in the case of *In re Custody of Townsend* (1981), 86 Ill. 2d 502, 427 N.E.2d 1231, as to criteria crucial to all cases where custody of children are in issue. Although this case involves guardianship of the person of a child which includes rights and responsibilities in addition to custody, there as here, the dispute was between a natural parent and those not a parent. The *Townsend* court deemed the two most significant elements to be the superior right of parents to custody of their children and the concern of the court for the best interests of the child. Citing *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 247 N.E.2d 417, the court held a nonparent seeking to acquire or retain the custody of a child against a parent had "the burden of demonstrating good cause or reason to supersede the superior right" of the parent. *In re Custody of Townsend* (1981), 86 Ill. 2d 502, 514, 427 N.E.2d 1231, 1237.

■■ ■ The *Townsend* court also said that courts should give significance to the claim of a nonparent "who has had actual or legal custody of the child for a substantial period of time, especially if the evidence shows that the child has become an integral member of a true family unit. [Citations.]" (86 Ill. 2d 504, 515, 427 N.E.2d 1231, 1238.) There, no prior court order of custody had been entered, and the court had no reason to address any requirement for showing a change in circumstances before a court should modify a custody order. Previous cases concerning modification of child custody in a divorce proceeding (*Nye v. Nye* (1952), 411 Ill. 408, 105 N.E.2d 300) and alteration of guardianship of the person (*Hohenadel v. Steele* (1908), 237 Ill. 229, 86 N.E. 717) have stated a change in circumstances is necessary before a court will alter a custody or guardianship order. The logic of this rule is that absent a change in circumstances, a court would be merely ruling on the exact issue previously decided. We conclude that some showing of a change in circumstances is necessary to support an order terminating a guardianship. As we later explain, a sufficient showing of change was made here.

Petitioners' argument that the guidelines of section 610 of the Illinois Marriage and Dissolution of Marriage Act should have been followed is based on the arguments that: (1) standards for orders concerning child custody should be the same regardless of the type of

proceeding involved; and (2) the lack of guidelines for determining "other good cause" under section 23—2(a)(10) of the Probate Act of 1975 require adoption of some detailed standards. In the case of *In re Adoption of Scheidt* (1980), 89 Ill. App. 3d 92, 411 N.E.2d 554, the Appellate Court for the Third District held that the standards set forth in sections 602 and 610 of the Illinois Marriage and Dissolution of Marriage Act were inapplicable to adoption and guardianship proceedings. (Ill. Rev. Stat. 1981, ch. 40, pars. 602, 610.) The court noted that the duties of guardian of the person of a minor might include custody but included several other responsibilities as well. It reasoned that, accordingly, the court should not imply a requirement that trial courts be subject to the constraints of section 610 in removing a guardian although the standards of section 610 might be looked to for guidelines.

We agree with the holding in *Scheidt*. Section 610 is a refinement of the change in circumstances rule and also refines the general rule stated in *Townsend* that consideration must be given to the affinity that may have developed between a ward and the custodial family. Had the exact guidelines of section 610 been binding on all custody proceedings, the *Townsend* court would have so stated. We conclude that the guidelines binding upon the court were those set forth in *Townsend*, and the requirement that some change in circumstances be shown.

■ Having passed upon the criteria to be considered, we now turn to a summary of the facts of this case. The parties agreed that the transcript of an adoption proceeding, wherein the Crails unsuccessfully sought to adopt Damion, be allowed into evidence at hearing on the petition. The undisputed evidence established that in April of 1980, Kirsten left Damion at the residence of Connie Grieve, who then took Damion to Mary Crail at the Eldorado Bowling Alley, all in Decatur.

The Crails testified that on that evening, Damion walked up to Mary and said, "Are you my new mommy?" and hugged and kissed her and went up to Robert Crail and said, "Are you Bob, are you my new dad?" The Crails stated that when Damion first came to them, he was very restless, wanted love and attention, and was very thin. They testified that within a day or two of coming to them, Damion indicated he disliked his mother, had been mistreated and beaten, and was not fed well.

Connie Grieve and Linda Fecho testified to an incident where they went to Kirsten's third floor apartment and found Damion sitting in an open, screenless window. They stated Kirsten took Damion

out of the window and hit him hard in the stomach. Grieve testified that Kirsten had said she hated Damion, and Brenda Deemer and Fecho both testified that Kirsten had said she did not want Damion. Grieve also testified to another occasion where Kirsten hit Damion in the stomach with her fist and to an occasion where she observed Kirsten smoke a marijuana cigarette in Damion's presence. Grieve additionally testified that the day Damion was sitting in the window, the apartment had odors of stale food, there was food sitting on the stove apparently having been there for days, trash in front of the door, and items on the floor.

Kirsten gave the following testimony: She did not give up custody of Damion on a permanent basis but let him go to the Crails so they could take care of him, as she was working late nights and having trouble with her babysitter. She had an oral agreement with the Crails that they would take Damion until she could get back on her feet. She denied saying she wanted to get rid of Damion. She stated she never beat or struck Damion but has "whipped" him. She understood the transfer of Damion to the Crails to be a temporary arrangement and did not understand the guardianship papers that she signed.

Kirsten continued testifying as follows: She is employed as a cook and waitress and brings home $130 per week. Her previous jobs included employment at the Ramada Inn, from which she was fired, caring for an elderly woman, and working at McDonald's. She currently is renting a home and has had three other residences since she gave Damion to the Crails. In April of 1981, she pleaded guilty to a charge of unlawful delivery of cannabis. She stated her situation has changed from the time she signed the guardianship papers, as she has a home and job and is more careful with whom she is associated.

Witnesses testifying on Kirsten's behalf stated that Kirsten and Damion get along well during visitation. A previous babysitter testified that Damion always looked clean and properly clothed although on one occasion Kirsten struck Damion with a metal coat hanger.

The minor was examined *in camera*. He testified he would like to live with the Crails because they would let him go to school and, unlike his mother, would buy things for him. He did say that his mother had toys for him to play with when he visited her and children were also around to play with. He testified that Crails spanked him when he was bad. He stated his mother had given him bloody noses when he lived with her but had not even spanked him when he was there on weekend visitations. He also said he does not love his mother, does not think she cares for him, and is afraid of her. He stated he loved the Crails and liked the children he lived with.

■ Prior to entering the order terminating the guardianship, but after considering the evidence, the trial court indicated that if the adoption petition of the Crails, being heard by another judge, was ultimately denied, the court would terminate the guardianship. The court apparently felt that to leave the child in guardianship but not subject to adoption would leave the child indefinitely in limbo. In the final order, the court found that the best interests of the child required that he be restored to the custody of his mother.

Although we are concerned with the ability and inclination of the mother to properly care for the minor, we do not find the trial court to have applied improper standards nor do we find its decision to be contrary to the manifest weight of the evidence.

■ Taken most favorably to the respondent mother, the evidence here fell short of requiring a determination she was unfit. Likewise, at least some showing was made that a change in circumstances existed. The mother's testimony indicated she no longer felt unable to cope with the child, and she was no longer working the late night hours as before. The less than two years' time period in which the minor had been in petitioners' home was not of sufficient length to require the trial court to continue the guardianship.

■ The major element in support of the decree is the mother's superior right as a natural parent in context with the manner in which the guardianship was initiated. The original petition upon which the agreed guardianship order was entered alleged she was "unable to properly care for the minor at [that] time." She testified to an understanding that the arrangement was to be temporary. To permit her to have another chance to care for the child would be in conformity with that agreement which the court could have found to have been made. The child is not now adoptable, and if he is ever to return to his mother, the trauma will be less the sooner that occurs. As we have indicated, much of the claims of improper care by the mother could have been negated by viewing the evidence most favorably to her. After so viewing the evidence and considering all of the circumstances, the trial court could properly decide the best interests of the minor were not so opposed to termination of the guardianship as to "supersede" her superior right as a parent. *In re Custody of Townsend* (1981), 86 Ill. 2d 502, 514, 427 N.E.2d 1231, 1237.

We affirm for the reasons stated.

Affirmed.

LONDRIGAN, J., concurs.

JUSTICE TRAPP, concurring in part and dissenting in part:

I concur in the affirmance of the termination of the guardianship and in the statement of the burden of proof, but I must dissent from the reasoning of the majority and from the arguable inferences that follow.

A statement of standards for judicial termination of a guardianship under the Probate Act of 1975 (Ill. Rev. Stat. 1979, ch. 110½, par. 1—1 *et seq.*) should not ignore the statutory mandate of section 11—7, which provides:

"If both parents of a minor are living and are competent to transact their own business and are fit persons, they are entitled to the custody of the person of the minor and the direction of his education. If one parent is dead and the surviving parent is competent to transact his own business and is a fit person, he is similarly entitled." Ill. Rev. Stat. 1979, ch. 110½, par. 11—7.

The custodial provisions of the guardianship greatly restrict, if they do not effectively terminate, parental rights of the mother. This is particularly so if one, as the majority does here, adopts the conclusion that termination of custodial guardianship under the Probate Act of 1975 requires a showing of a change of circumstances.

The statute itself suffices to establish the "good cause" to terminate the guardianship where the parent who requests termination has not been found to be unfit, and where there are no testamentary or other property interests which require particular attention.

The terms of section 11—7 of the Probate Act of 1975 concerning custody are consistent with the terms of section 1 of the Adoption Act (Ill. Rev. Stat. 1979, ch. 40, par. 1501) and the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 701—1 *et seq.*). For purposes of adoption, section 8 of the Act (Ill. Rev. Stat. 1979, ch. 40, par. 1510) requires the consent of the natural parent unless that parent has been found to be an unfit person as defined by statute. To remove custody or guardianship from the natural parent under the Juvenile Court Act, section 5—7 requires the judicial finding that the natural parents "are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect ***." Ill. Rev. Stat. 1979, ch. 37, par. 705—7.

The provision of the three statutory schemes for custody or guardianship retain the keystone that the natural parent be found to be unfit to have custody. In these probate proceedings, there is no finding that the natural mother is unfit.

In such light, I must disagree with the majority view that the Pro-

bate Act of 1975 states no standard for judicial termination of a guardianship and concludes that it is necessary to follow the language of a series of cases where guardianship under the Probate Act of 1975 was not in focus. Thus, *In re Custody of Townsend* (1981), 86 Ill. 2d 502, 427 N.E.2d 1231, worked from the presumption of the superior right of a natural parent as distinguished from the statutory right to custody in a parent who was fit.

I can find no valid reason to treat the statutory provision for parental custody under the Probate Act of 1975 in a different way than the comparable provisions of the Adoption Act and the Juvenile Court Act. See concurring opinion of Justices Klingbiel, Schafer and House in *Giacopelli v. Florence Crittenton Home* (1959), 16 Ill. 2d 556, 158 N.E.2d 613.