452

*In re* ESTATE OF K.E.S. *et al.*, Minors (Joseph T. Schneider *et al.*, Petitioners-Appellees, v. Amy J. Schneider, Respondent-Appellant . (Mark E. Sliney, Respondent)).—*In re* ESTATE OF K.E.S. *et al.*, Minors (Joseph T. Schneider *et al.*, Petitioners, v. Amy J. Schneider *et al.*, Respondents-Appellees (Mark E. Sliney, Respondent; Karen Coates *et al.*, Intervenors-Appellants)).

Fourth District Nos. 4—03—0612, 4—03—0625 cons.

Argued February 25, 2004.—Opinion filed March 30, 2004.—Rehearing denied May 10, 2004.

Adele M. Saaf (argued), of Bloomington, for appellants Amy J. Schneider and Mark E. Sliney.

James T. Jackson (argued) and Bridget C. Hogan, both of Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, for appellants Karen Coates and Dan Coates.

Kurt B. Bickes (argued), of Bickes, Wilson & Moss, of Decatur, for appellee Benito DiTerlizzi.

JUSTICE MYERSCOUGH delivered the opinion of the court:

After a hearing in January 2003, the trial court denied Amy J. Schneider's petition to terminate guardianship of her biological children, K.E.S. and J.M.S., and the petition of Karen and Dan Coates (the Coateses) to be appointed successor guardians. The court confirmed guardianship in Benito DiTerlizzi. Two separate appeals have been filed. In No. 4—03—0612, Amy appeals the denial of her petition to terminate guardianship, arguing (1) the trial court committed reversible error by not dismissing the Coateses, intervenors, from the lawsuit; (2) the court exceeded its authority by permitting Benito, the surviving guardian, to maintain guardianship after he allowed the minor children to reside with Karen and Dan Coates, the intervenors; (3) the court erred in finding that disputed questions of fact be decided against Amy; (4) the court's finding that Amy and Benito had consensual sex was against the manifest weight of the evidence; and (5) the court abused its discretion by failing to remove Benito as guardian. In No. 4—03—0625, Karen and Dan Coates appeal the denial of their petition to be appointed successor guardians, arguing (1) the trial court erred in denying their petition for appointment of successor guardian, and (2) the court erred by ordering them to pay one-half of the guardian *ad litem* (GAL) fees. We affirm in part and remand in part with directions.

## I. BACKGROUND

On January 23 and 24, 2003, the trial court held a hearing on Amy's petition to terminate guardianship and the Coateses' petition to be appointed successor guardians. Testimony and evidence admitted in the January 2003 hearing revealed the family history leading up to Amy's petition to terminate guardianship.

Amy Schneider and Mark Sliney are the natural parents of K.E.S. and J.M.S. Amy and Mark were married on May 27, 1988. K.E.S. was born on June 21, 1988; J.M.S. was born on October 22, 1989. When Amy and Mark were divorced on June 26, 1991, the issue of child custody was not decided. At the time of the divorce, Amy resided in Bloomington, Illinois, and Mark resided in St. Louis, Missouri. The children were living in Decatur, Illinois, with Amy's parents, Joseph and Joan Schneider (the Schneiders).

Amy testified that she attempted to put the children up for adoption shortly after J.M.S. was born. Eventually, Amy voluntarily gave physical possession of the children to her parents, the Schneiders. Amy testified that she felt she was unable to care for the children because she was suffering from financial, mental, and emotional difficulties.

In June 1993, the children moved to Bellevue, Washington, to live with their maternal aunt and uncle, Christine and Benito DiTerlizzi. On November 12, 1993, the Schneiders filed a petition for appointment of guardians of minors' persons, pursuant to section 11—5 of the Probate Act of 1975 (Probate Act) (755 ILCS 5/11—5 (West 1992)), seeking to declare Christine and Benito DiTerlizzi guardians of K.E.S. and J.M.S. Mark Sliney was defaulted for failing to appear.

The record shows that on November 12, 1993, the trial court appointed Christine and Benito DiTerlizzi temporary guardians of K.E.S. and J.M.S. On March 16, 1995, the trial court appointed Christine and Benito as plenary coguardians of K.E.S. and J.M.S., then six and five years old. In its order, the court found that Amy had not exhibited responsibility for her children or stability since September 1990; Amy had not manifested a willingness to provide food, clothing, shelter, or nurture for the children; the children desired to live with Christine and Benito; and Christine and Benito had sufficient income to provide for the children. The court concluded that it was in the best interests of the minor children that Christine and Benito be appointed as coguardians to K.E.S. and J.M.S.

The children continued living with Christine and Benito in Washington, calling them "mom" and "dad." In November 1998, Christine was diagnosed with cancer. In July 2001, Amy traveled to Washington to visit her ailing sister and Benito. When Amy came to visit, the children were visiting their grandparents, the Schneiders, in Decatur, Illinois. Amy testified that during this visit, Benito attempted to rape her. She also testified that she was intoxicated that night. Benito testified that the two had consensual sex. Benito also testified that Amy and her paramour, Wayne, had attempted to extort money from him after Amy returned home. They promised to keep the "rape" secret in exchange for money. Benito testified that it was only after he refused to comply with their request that he was visited by the police (1½ months after the sexual encounter). After this visit by the police, Benito testified that he heard nothing further from them. No charges were ever filed.

On August 17, 2001, Christine died, leaving Benito as the sole guardian of K.E.S. and J.M.S. Christine's will named her other sister, Karen Coates, as the successor guardian of K.E.S. and J.M.S. in the event Benito was unable or unwilling to care for the children. The will also named Karen as successor trustee of a "$5-600,000.00" trust (estimates varied) established for the children's care if she were to become guardian. K.E.S. and J.M.S. continued living in Washington with Benito until August 2002.

At the January 2003 hearing, Benito testified that the children

had been honor students in the past but had academic difficulties during the school year following Christine's death. He also testified that he was "exhausted" as a result of his wife's long illness and later death and the allegations of rape. At the request of K.E.S. and Karen Coates, Benito agreed to let the children move to Texas to live with the Coateses for the following school year. Benito characterized this relocation as being on a "trial basis." The relocation arrangement was reduced to writing in a document entitled "agreement for temporary living arrangements," dated August 28, 2002.

In this agreement, Benito authorized the Coateses to enroll the children in school and obtain medical treatment. The agreement stated in part as follows:

> "This living arrangement is expected to last through May 2003, but may possibly be extended by mutual agreement of the parties. Therefore, I am providing my indefinite authorization for school enrollment and medical treatment for as long as the children are living in Texas. However, if the children make a request, after adequate deliberation, to return to live with me, the Coates[es] shall consult with me and return the children, if I so request. Nothing in this [a]greement shall affect my rights as a guardian, and the Coates[es] agree not to take any action, directly or indirectly, that would adversely affect those rights."

On August 28, 2003, both Benito and Karen signed the agreement. On August 29, 2002, K.E.S. and J.M.S. moved in with the Coates family in Texas.

At the January 2003 hearing, Amy testified that she learned of the plan to relocate the children days before their scheduled departure. On August 22, 2002, Amy filed a petition for temporary restraining order and preliminary injunction, seeking to prevent the children from moving to Texas. On August 30, 2002, she filed a motion to terminate Benito's guardianship, seeking to regain custody of the children. In Amy's amended petition to terminate guardianship, filed September 30, 2002, she stated that a substantial change in circumstances had occurred since the original entry of guardianship, *i.e.*, Benito's transfer of physical custody to the Coateses and improvements in her lifestyle, and it was therefore in the children's best interests that they reside with her. Amy also petitioned to receive visitation with the children in the interim.

On October 29, 2002, Benito responded with a motion to dismiss Amy's petition to terminate guardianship. He also moved to have the Coateses added as parties to the litigation, stating that a complete determination of the issues could not be made without their presence as parties. The Coateses also filed a petition to intervene, requesting

to be named successor coguardians of the children. The court appointed a GAL to represent the children's interests.

On November 21, 2002, the trial court held a hearing on the parties' pretrial motions. Amy testified in support of her petition for visitation. The Coateses called Joan Schneider, Amy's mother, as a witness in opposition to the petition for visitation. In a written order filed November 25, 2002, the court found that there had been very little contact between Amy and the children since their placement with Christine and Benito. The order acknowledged Amy's testimony that her life had improved since the children were placed with Christine and Benito and that she was self-employed and under the care of a psychiatrist. The court further found that while Amy had "made a good appearance in court," the court "still has numerous questions about her health and style of life." The court denied the petition to dismiss the petition to terminate guardianship, granted the Coateses leave to intervene, and granted Amy temporary unsupervised visitation from December 26, 2002, until January 2, 2003, on the condition she pay for round-trip airline tickets.

During the January 23 and 24, 2003, hearing, the trial court heard testimony from eight witnesses: Jennifer Hall, Amy, Benito, Karen, Wayne (Amy's paramour), Jane Schneider, and the two children (*in camera*).

Jennifer Hall, a licensed clinical professional counselor, testified that she had treated Amy during approximately 10 sessions. Jennifer testified that Amy was diagnosed with "bipolar II disorder." Jennifer also testified that Amy's manic periods were often marked by inappropriate sexual behavior and Amy had been treated for alcohol addiction. Jennifer testified that Amy had been scored as a "55" out of 100 points on the "global assessment of functioning scale." Jennifer agreed that individuals in this category generally have moderate difficulty in social and occupational functioning. Jennifer also stated that Amy was taking medication to treat her bipolar disorder.

In her testimony, Amy described her state of mind during the original guardianship proceedings in 1993-95 as "chaotic" and "undisciplined." Amy testified that she had taken amphetamines daily and been diagnosed as having an "alcohol dependence." Since the original guardianship proceedings, Amy testified that she had received treatment from an alcohol-treatment facility on two occasions, had stopped taking amphetamines, and was taking medication for her bipolar disorder. Amy stated that she had also moved into a house with two of her other children and their father, Wayne. She testified that Wayne has custody of their two children and she was pregnant with their third.

She also testified that she had seen K.E.S. and J.M.S. on a few occasions, although she had multiple opportunities to see them, and she had not paid any child support in over seven years though ordered to do so. Amy admitted that "there's no excuse" for her failure to pay child support.

Jane Schneider, Amy's sister, testified that Amy and Wayne had difficulties in their relationship, often resulting in Wayne "kicking Amy out" of their house. She also stated that she and Amy had discussed Amy and Benito's sexual encounter. Jane testified that Amy never described the encounter as a "rape." Rather, Amy explained that she had "slept with Benito" but she did not remember it because she was "drunk."

In its written judgment filed on April 3, 2003, the trial court identified "two important legal concepts involved in this litigation": requisite elements for guardianship termination and guardianship appointment. The court reasoned as follows:

"The first concept is concerned with the required elements to justify a termination of a guardianship in favor of the biological parent. The [c]ourt believes that the law to be as follows on this issue:

'We adopt the *Wadman* analysis. [*In re Estate of Wadman*, 110 Ill. App. 3d 302, 442 N.E.2d 333 (1982).] Petitioner had to show some change [in] circumstances, or otherwise she could bring frequent petitions to terminate at any time, but first respondent had the burden of proof to overcome the superior-[rights] doctrine that a parent has a superior right to custody of her minor children. Further, respondent had to show that it was in the children's best interest that she retain the guardianship.' [*In re Estate of Webb*, 286 Ill. App. 3d 99, 101, 675 N.E.2d 192, 194 (1996)]."

The court identified the second concept, quoting section 11—5(b) of the Probate Act:

" 'The [c]ourt lacks jurisdiction to proceed on a petition for the appointment of a guardian of a minor if (i) the minor has a living parent, adoptive parent[,] or adjudicated parent[,] whose parental rights have not been terminated, whose whereabouts are known[,] and who is willing and able to make and carry out day-to-day [child-care] decisions concerning the minor, unless the parent or parents consent to the appointment [or], after receiving notice of the hearing under [s]ection 11—10.1, fail to object to the appointment at the hearing on the petition[,] or (ii) there is a guardian for the minor appointed by a court of competent jurisdiction. [There] shall be a rebuttable presumption that a parent of a minor is willing and able to make and carry out day-to-day child[-]care decisions concerning the minor, but the presumption may be rebutted by a preponderance of the evidence.' 755 ILCS 5/11—5(b) (West 2002)."

The court continued, stating this statutory section is "important if the court determines that the guardian abandoned his position by placing the children with the Coateses, and whether the court should have allowed the Coateses to become intervenors and rebut the presumption by a preponderance of the evidence. [*In re Estate of Johnson,* 284 Ill. App. 3d 1080, 1091, 673 N.E.2d 386, 393 (1996)]."

The court further found as follows:

(1) Findings of fact should be decided against Amy.

(2) Amy had seen the children only two times between January 10, 1995, and December 2002.

(3) Amy failed to show a change in circumstances since the guardianship was originally instituted.

(4) Even if there had been a change of circumstances and the parental superior-rights doctrine applied, the guardian has overcome the doctrine.

(5) The guardian has overcome the doctrine because:

(a) Amy only saw the children twice in eight years, other than court-arranged visitation;

(b) Amy is a stranger to her children;

(c) Amy had opportunities to visit the children but chose not to do so;

(d) Amy has two other children and is pregnant with a third;

(e) Amy is not married to the father of these children and is therefore not a good role model for a teenage daughter and son (K.E.S. and J.M.S.);

(f) The father of the other children has custody of them;

(g) Amy has bipolar disorder and has had an alcohol problem;

(h) Amy never paid any child support, despite her claim that she is able to support the children financially; and

(i) Amy and Benito had consensual sex.

The trial court stated that it was in the children's best interests that they remain with the guardian given their "loving and respectful relationship" with him. The court also found that the guardian did not abandon the guardianship by placing the children with the Coateses for a trial period of one year. The court found this relocation to be no different from sending the children to a boarding school. Finally, the court found that it had "improvidently allowed the Coateses to intervene."

The court ordered the following, in part:

"(1) Amy's petition to terminate guardianship is denied;

(2) The Coateses' petition to be appointed guardian is denied,

(3) Amy is granted four weeks' visitation,

(4) The [GAL] is awarded $5,558.32 in fees. The [g]uardian shall pay one-half and the intervenors shall pay one-half."

## II. ANALYSIS

This appeal followed. Amy appeals the denial of her petition for termination of guardianship. The Coateses appeal the trial court's denial of their petition for appointment and assessment of GAL fees. We affirm the trial court's denial of Amy's petition to terminate guardianship because she did not prove the requisite change in circumstance. We remand this matter to the trial court to consider the Coateses' petition to be appointed successor guardians.

■ The most important consideration in child custody disputes is the best interest of the child. *In re Custody of K.P.L.*, 304 Ill. App. 3d 481, 487-88, 710 N.E.2d 875, 879 (1999). On review, the trial court is granted great deference in deciding custody issues as it is in the best position to judge the credibility and demeanor of witnesses and evaluate the needs of the child. *Gren v. Gren*, 59 Ill. App. 3d 624, 626, 375 N.E.2d 999, 1000 (1978). Therefore, the trial court's custody determinations will not be disturbed unless they are found to be against the manifest weight of the evidence. *In re Marriage of Karonis*, 296 Ill. App. 3d 86, 88, 693 N.E.2d 1282, 1284 (1998). "A judgment is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary[,] or not based on the evidence." *K.P.L.*, 304 Ill. App. 3d at 488, 710 N.E.2d at 879, citing *In re Marriage of Hefer*, 282 Ill. App. 3d 73, 80, 667 N.E.2d 1094, 1100 (1996). Whether the trial court applied the proper legal standard is a question of law and therefore subject to *de novo* review. *In re Marriage of Sobol*, 342 Ill. App. 3d 623, 627, 796 N.E.2d 183, 186 (2003).

### A. The Trial Court Properly Denied Amy's Petition To Terminate Guardianship

Amy appeals the trial court's denial of her petition. She argues that the trial court incorrectly settled questions of fact, exceeded its authority by permitting Benito to maintain guardianship while the children resided with the intervenors, and abused its discretion by failing to remove Benito as guardian.

### 1. *Benito Satisfied the Burden Placed on a Third Party Seeking To Retain Custody*

Amy argues that the trial court abused its discretion by failing to terminate the children's guardianship. Specifically, Amy claims that by allowing the children to move to Texas, Benito violated his statutory duties as guardian and should be removed under section 23—2(a)(10) of the Probate Act (755 ILCS 5/23—2(a)(10) (West 2002)).

■ The Probate Act does not address the termination of a guardian prior to the minor reaching the age of majority. But see *Wadman*,

110 Ill. App. 3d at 305, 442 N.E.2d at 335. The seminal case dealing with the issue of child custody between a natural parent and third person, *In re Custody of Townsend*, 86 Ill. 2d 502, 508, 427 N.E.2d 1231, 1234 (1981), stated that there is "an accepted presumption that the right or interest of a natural parent in the care, custody[,] and control of a child is superior to the claim of a third person." The *Townsend* court went on to state that this presumption, also known as the superior-rights doctrine, "is not absolute and serves only as one of several factors used by courts in resolving the ultimately controlling question of where the best interests of the child lie." *Townsend*, 86 Ill. 2d at 508, 427 N.E.2d at 1234.

■ A third party seeking to obtain or retain custody of a child as against the natural parent bears the initial burden. To satisfy this burden, the third party must "demonstrate good cause or reason to overcome" the superior-rights doctrine and also show that it is in the child's best interest that the third party be awarded custody. *Townsend*, 86 Ill. 2d at 510-11, 427 N.E.2d at 1235-36.

This court, in *Wadman*, concluded that in addition to the requirements in *Townsend*, the natural parent must show a change in circumstances. *Wadman*, 110 Ill. App. 3d at 305, 442 N.E.2d at 335. Otherwise, the *Wadman* court reasoned, the court would merely be ruling on the exact issue it previously decided in awarding guardianship. *Wadman*, 110 Ill. App. 3d at 305, 442 N.E.2d at 335.

■ Absent statutory standards for termination of guardianship, the *Townsend-Wadman* standards control and govern a natural parent's attempt to terminate a guardianship established under the Probate Act. The court in *Webb*, 286 Ill. App. 3d at 101, 675 N.E.2d at 194, clarified this standard, stating as follows:

> "[The natural parent] had to show some change in circumstances, or otherwise she could bring frequent petitions to terminate at any time, but first [the guardian] had the burden of proof to overcome the superior-rights doctrine that a parent has a superior right to custody of her minor children. Further, [the guardian] had to show that it was in the children's best interests that she retain the guardianship."

■ In its judgment, the trial court correctly identified *Wadman* as controlling. Under the first step of the analysis, the court stated that Benito had successfully overcome the superior-rights doctrine. As referenced above, the court, in its April 3, 2003, written judgment, then cited seven factors it considered in arriving at this conclusion (Amy only saw the children twice in eight years; Amy is a stranger to her children; Amy had opportunities to visit the children but chose not to do so; Amy has two other children and is pregnant with a third;

Amy is not married to the father of these children, so is not a good role model for teenagers; Amy does not have custody of her later-born children; Amy has bipolar disorder and has had an alcohol problem; and Amy has never paid any child support, despite her claim that she is able to financially support the children).

Having successfully rebutted the superior-rights presumption, the trial court considered the best interests of the children. The court concluded: "it is in the best interest of the children that they remain with the guardian since he has been a father to these children for eight years and they love and respect him dearly." Finally, the court found that Amy had failed to show a change of circumstances since the time the guardianship had been instituted, referring to the 1995 order creating the guardianship.

Amy claimed that the children's relocation to Texas was a sufficient change in circumstances warranting a termination of the guardianship. The trial court was unpersuaded. It found, and we agree, that Benito did not abandon the guardianship by allowing the children to move for a trial period of one year. On appeal, Amy argues that Benito violated his duties as guardian when the children's residence switched to the Coateses' home in Texas. Section 11—13(a) of the Probate Act, "Duties of guardian of a minor," states that the guardian "shall have the custody, nurture[,] and tuition and shall provide education of the ward." 755 ILCS 5/11—13(a) (West 2002). However, relinquishing physical possession of the children to attend school elsewhere is not a violation of section 11—13(a). The trial court likened this situation to sending the children to a boarding school, which is not indicative of relinquishing custody. *In re Marriage of Howard*, 291 Ill. App. 3d 675, 679, 684 N.E.2d 178, 180 (1997).

For this reason, we also reject Amy's claim that the trial court exceeded its authority by permitting the children to live with the Coateses while simultaneously maintaining Benito as guardian. Sending the children to another state for the purpose of attending school is not a relinquishment of custody. *Howard*, 291 Ill. App. 3d at 679, 684 N.E.2d at 180. Benito expressly retained his guardianship in the agreement for temporary living arrangements. Benito may allow the children to live in Texas to attend school while retaining his guardianship.

While we acknowledge Amy's superior rights, we find that the trial court applied the proper standards and that its decision to deny Amy's petition to terminate guardianship was not contrary to the manifest weight of the evidence. Benito successfully bore the initial burden to overcome the superior right of Amy and demonstrate that the best interests of the children required his continued guardianship.

The burden then shifted to Amy to prove a change in the circumstances that had necessitated instituting the guardianship. The court found that Amy was unable to satisfy this requirement, and we agree.

### 2. *The Trial Court Did Not Err in Its Findings of Fact*

■ Amy also argues that the trial court erred when it stated in its written judgment that all disputed questions of fact be decided against her. Amy also appeals the court's finding that she and Benito had consensual sex.

Amy had the burden of proving a substantial change of circumstance. She did not carry that burden. The trial court found that disputed questions of fact should be decided against Amy as she had the burden of proving a substantial change of circumstances. We cannot say that the trial court's factual findings were against the manifest weight of the evidence. Moreover, many of the facts relied upon by the trial court in denying Amy's petition were not disputed but were admitted by Amy.

Amy's rape claim was disputed. However, we agree that the trial court is in the best position to make credibility and factual determinations, and we therefore will not disturb them in this case.

### B. The Coateses May Be Properly Considered for Guardianship; Assessing GAL Fees Was Proper

Both Amy and the Coateses challenge the way the trial court proceeded on the issue of intervention. Amy argues that the trial court committed reversible error when it failed to dismiss the Coateses as intervenors before the hearing on the petition to terminate guardianship. Specifically, Amy claims that this failure to dismiss prejudiced her rights by improperly exposing the court to the intervenors' evidence and confusing the applicable burdens of proof. The Coateses argue that the trial court was correct in allowing them to intervene in the litigation but applied incorrect legal standards in adjudicating their petition to be appointed guardians of the children. The Coateses also appeal the trial court's assessment of GAL fees. We will address both appellants' arguments in turn.

### 1. *The Coateses Had Standing, So Intervention Was Proper*

■ The decision to allow or deny intervention, whether permissively or as of right, is a matter of sound judicial discretion that will not be reversed absent an abuse of that discretion. *In re Application of the County Collector of Du Page County for Judgment for Delinquent Taxes for the Year 1992*, 181 Ill. 2d 237, 247, 692 N.E.2d 264, 269 (1998); see *Regnery v. Meyers*, 345 Ill. App. 3d 678, 683, 803 N.E.2d 504, 509 (2003).

Intervention in civil proceedings is governed by section 2—408 of the Code of Civil Procedure (735 ILCS 5/2—408 (West 2002)), which provides in relevant part:

"(a) Upon timely application anyone shall be permitted as of right to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant will or may be bound by an order or judgment in the action; or (3) when the applicant is so situated as to be adversely affected by a distribution or other disposition of property in the custody or subject to the control or disposition of the court or a court officer.

(b) Upon timely application anyone may in the discretion of the court be permitted to intervene in an action: (1) when a statute confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common." 735 ILCS 5/2—408(a), (b) (West 2002).

This section liberally allows the practice of intervention so as to avoid the unnecessary relitigation of issues in a second suit. *Caterpillar Tractor Co. v. Lenckos*, 84 Ill. 2d 102, 111-12, 417 N.E.2d 1343, 1349 (1981). "Although a party need not have a direct interest in the pending suit, it must have an interest greater than that of the general public, so that the party may stand to gain or lose by the direct legal operation and effect of a judgment in the suit." *People ex rel. Birkett v. City of Chicago*, 202 Ill. 2d 36, 57-58, 779 N.E.2d 875, 887 (2002), citing *Caterpillar Tractor Co.*, 84 Ill. 2d at 112, 417 N.E.2d at 1349.

■ When seeking custody of a child under the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 through 802 (West 2002)) or the Probate Act (755 ILCS 5/23—2(a)(10) (West 2002)), as here, a nonparent must meet a threshold standing requirement. *In re Person & Estate of Barnhart*, 232 Ill. App. 3d 317, 320, 597 N.E.2d 1238, 1240 (1992), citing *In re Person & Estate of Newsome*, 173 Ill. App. 3d 376, 379, 527 N.E.2d 524, 525 (1988). To have standing, the party must allege and prove that the child was not in the physical custody of one parent at the time the petition was filed. 750 ILCS 5/601(b)(2) (West 2002).

■ We cannot say that the trial court abused its discretion in permitting the Coateses to intervene. The Coateses' interest in the litigation qualified them as proper intervenors under the Code of Civil Procedure. They sought termination of Benito's guardianship and requested guardianship of the children. The children were living with the Coateses when they filed their petition, and Karen Coates had been named successor guardian and trustee in Christine's will. These

two facts not only gave the Coateses an interest in the litigation, but also made the Coateses' evidence relevant to the court's assessment of both the best interests of the children and change in circumstances. Had the court not allowed intervention, it could not have thoroughly made these assessments. Further, the Coateses could have filed a separate action seeking removal and guardianship. Given the increasing age of the children, the number of years their custody has been in dispute, and the resulting emotional and financial cost of such proceedings, duplicitous litigation would have been especially undesirable. Moreover, the Coateses easily satisfied the standing requirement for child custody proceedings because the children were not in the physical custody of either biological parent. 750 ILCS 5/601(b)(2) (West 2002).

### 2. *The Trial Court May Reconsider the Coateses' Petition To Be Appointed Successor Guardians*

In its written judgment, the trial court stated: "[T]he [c]ourt does not agree with the respondent, [GAL], and interveners that the [c]ourt could give guardianship to the Coateses without applying the standard of [section 11—5(b) of the Probate Act (755 ILCS 5/11—5(b) (West 2000)),] which the [p]etitioner might successfully challenge." In the next paragraph, the court concluded that it had improvidently allowed the Coateses to intervene. These statements in the written judgment and excerpts from the court transcripts reveal that the trial court considered itself bound by *Johnson*, 284 Ill. App. 3d 1080, 673 N.E.2d 386.

*Johnson* held that where a nonparent seeks appointment as guardian of a child who has at least one living natural parent, the nonparent must first show that he has standing. *Johnson*, 284 Ill. App. 3d at 1090, 673 N.E.2d at 392. Whether the nonparent has standing to petition for guardianship depends on whether the nonparent has rebutted the presumption that the natural parent is willing and able to make and carry out day-to-day child-care decisions, as required by section 11—5(b) (755 ILCS 5/11—5(b) (West 2002)). *Johnson*, 284 Ill. App. 3d at 1091, 673 N.E.2d at 393. This requirement is identified as a codification of the superior-rights doctrine. *Johnson*, 284 Ill. App. 3d at 1090, 673 N.E.2d at 393.

We do not find *Johnson* applicable to the case before us. The *Johnson* court correctly applied the requirements of section 11—5(b) to the original creation of a guardianship. However, our case involves replacing the guardian in a preexisting guardianship. In our case, the trial court applied *Johnson* and the requirements of section 11—5(b). Allowing the removal of the original guardian and naming a successor

guardian does not fall within the purview of *Johnson* or section 11—5. The trial court was not required to first terminate the guardianship and then start over by creating a new one.

 Section 11—5(b) requires the trial court to consider the natural parent's rights and abilities with regard to the child. In this case, that is unnecessary. The trial court correctly applied the *Townsend-Wadman* analysis and decided not to restore custody to Amy, the natural mother. In doing so, the court considered and gave proper deference to the mother's superior rights. Once the court had decided to continue the guardianship, her interest in the matter was extinguished. The court then had the duty and power to designate who, between Benito and the Coateses, should serve in the guardianship. Section 11—18 of the Probate Act, "Successor guardian," empowers the court to appoint a successor guardian upon the death, incapacity, resignation, or removal of a guardian. 755 ILCS 5/11—18 (West 2002).

 Benito, the Coateses, and K.E.S. all agreed that the Coateses should become successor guardians. Benito wished to resign as guardian if the Coateses would replace him. Benito initiated Karen Coates's involvement in the litigation when he moved to add her as a "party respondent." At the January 2003 hearing, Benito testified as follows:

> "MR. BICKES [(Benito's Attorney)]: Do you believe that it's in the children's best interest to terminate the guardianship and return them to Amy?
>
> BENITO: Absolutely not.
>
> MR. BICKES: Do you believe it's in the children's best interest to continue the guardianship and appoint a successor guardian?
>
> BENITO: Yes. That's fair.
>
> * * *
>
> MR. BICKES: [I]f the [c]ourt was inclined to keep the guardianship and appoint a successor guardian, who would you recommend as the successor guardian?
>
> BENITO: The Coates[es]."

The Coateses stated in their petition for appointment of successor guardians: "[T]he current court-appointed guardian, Benito DiTerlizzi, wishes to relinquish day-to-day responsibility of the children and his guardianship to [the Coateses]." K.E.S. nominated the Coateses to be her guardian, as permitted by section 11—5(c). 755 ILCS 5/11—5(c) (West 2002).

We, therefore, remand this matter to the trial court. The trial court, in light of the foregoing, may now determine which individual(s) should serve as guardian to the children. The court may, but is not required to, appoint the Coateses to replace Benito as the

children's guardians. The court may do so based upon evidence from the proceedings below and is not required to hold an additional evidentiary hearing.

### 3. *The Coateses Were Properly Ordered To Pay Half of the GAL Fees*

On appeal, the Coateses argue that they were improperly ordered to pay one-half of the GAL fees. Determination of who must pay GAL fees rests within the discretion of the trial court. *In re Estate of Dyniewicz*, 271 Ill. App. 3d 616, 622-23, 648 N.E.2d 1076, 1081 (1995).

Here, the trial court ordered the GAL fees be paid by the Coateses and Benito, equally. The court explained that it was unlikely that Amy would be able to pay; therefore, to avoid unfairness to the court-appointed GAL, it ordered the Coateses and Benito to share in the cost. We find that it was not an abuse of the trial court's discretion to order the intervenors to pay one-half of the fees.

### III. CONCLUSION

For the reasons stated above, in No. 4—03—0612, we affirm; in No. 4—03—0625, we affirm in part and remand in part with directions.

No. 4—03—0612, Affirmed.
No. 4—03—0625, Affirmed in part and remanded with directions.

KNECHT, P.J., and STEIGMANN, J., concur.