NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 241026-U

NOS. 4-24-1026, 4-24-1063 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 18, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* GUARDIANSHIP OF J.O., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (James Ort Sr., | ) | Winnebago County |
|     Petitioner-Appellant, | ) | No. 21P304 |
|     v.    (No. 4-24-1026) | ) | |
| Jasmine Oliver, | ) | |
|     Respondent-Appellee). | ) | |
| | ) | |
| *In re* GUARDIANSHIP OF J.O., a Minor | ) | |
| | ) | |
| (James Ort Jr., | ) | |
|     Petitioner-Appellant, | ) | |
|     v.    (No. 4-24-1063) | ) | |
| Jasmine Oliver, | ) | |
|     Respondent-Appellee). | ) | Honorable |
| | ) | Gwyn Gulley, |
| | ) | Judge Presiding. |

        JUSTICE CAVANAGH delivered the judgment of the court.
        Presiding Justice Harris and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) If, after being served with a complaint, a party fails to appear in the case, the party is not entitled, under Illinois Supreme Court Rule 104(b) (eff. Jan. 1, 2018), to be served with further documents that are filed in the case.

        (2) In a proceeding to terminate the guardianship of a child, the only relief the circuit court may grant under section 11-14.1(b) of the Probate Act of 1975 (755 ILCS 5/11-14.1(b) (West 2022)) is discharge of the guardian and termination of the guardianship, not relocation of the child.

        (3) Because the termination of the guardianship in this case was premised on the mother's being able to relocate the child from Illinois to Arizona, and because her petition for relocation that she had filed in a separate case had not yet been

granted, the decision to terminate the guardianship was against the manifest weight of the evidence.

¶ 2    Originally, in this guardianship case, the circuit court of Winnebago County found that J.O. (the child) was a minor who lacked parents who were ready, willing, and able to make day-to-day decisions regarding his care. Consequently, the court granted a petition by the child's paternal grandfather, James Ort Sr. (the grandfather), to be appointed as the child's guardian.

¶ 3    Pursuant to section 11-14.1(b) of the Probate Act of 1975 (Probate Act) (755 ILCS 5/11-14.1(b) (West 2022)), the child's mother, Jasmine Oliver (the mother), filed a petition in this case to terminate the guardianship. Then, in an amended petition, she requested not only to terminate the guardianship but also to relocate the child from Illinois to Arizona. After several days of evidentiary hearings, the circuit court not only terminated the guardianship but also gave the mother permission to relocate the child.

¶ 4    The trouble is, this relocation was inconsistent with the parenting plan and allocation judgment to which the mother and the child's father, James Ort Jr. (the father), had agreed in a separate case, Winnebago case No. 17-F-955 (the family law case). After the mother petitioned in the present case to terminate the guardianship, the father sought relief in the family law case. He filed a petitioned in the family law case to (1) restrict her parenting time and (2) prohibit her from relocating the child to Arizona. The mother responded in kind in the family law case. She petitioned for (1) a restriction of the father's parenting time, (2) permission to relocate the child to Arizona, and (3) modifications of the parenting plan and allocation judgment to accommodate the proposed relocation. It appears that those petitions by the mother and father are still pending in the family law case.

¶ 5    Nevertheless, in this guardianship case, the circuit court ordered not only the

- 2 -

termination of the guardianship but also the relocation of the child to Arizona. The court took up the issue of relocation despite its earlier refusal to consolidate the family law case with the guardianship case.

¶ 6 This perceived end-running of the family law case is one of the reasons why the grandfather and the father appeal in the guardianship case. They argue that, in the proceeding under section 11-14.1(b) of the Probate Act, the circuit court lacked statutory authority to order the relocation of the child. They maintain that the court had such authority only in the family law case. They also challenge the court's decision to terminate the guardianship, arguing that the decision is against the manifest weight of the evidence. Besides challenging the sufficiency of the evidence, they criticize the decision as the product of various other errors: a refusal to continue the trial to allow more time for discovery on the mother's amendments to her petition, a consideration of documents that were never offered in evidence, and a disregard of the automatic stay in section 2-1203(b) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1203(b) (West 2022)). Another supposed procedural error, of which the father complains, is that the mother never served any of her pleadings or motions upon him in the guardianship case.

¶ 7 The father, however, was served with the pleading that initiated the guardianship case: the grandfather's petition to be appointed as the child's guardian. Nevertheless, it was not until years later that the father appeared in the guardianship case. Until he appeared in the guardianship case, he was not entitled to be served with any of the documents filed therein. See Ill. S. Ct. R. 104(b) (eff. Jan. 1, 2018).

¶ 8 Under the parenting plan, though, the father had the right to written notice of the proposed relocation, including the address of the intended new residence. Also, the father and the grandfather have a point about the circuit court's lack of authority, under section 11-14.1(b) of

the Probate Act, to order the relocation of the child. Under that section of the Probate Act, all the court had authority to do was "discharge the guardian and terminate the guardianship." 755 ILCS 5/11-14.1(b) (West 2022). Relocation, by contrast, was governed by section 609.2 of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/609.2 (West 2022)), the statute the mother invoked in the family law case.

¶ 9        Refusing to consolidate the family law case into the guardianship case ultimately caused the decision to terminate the guardianship to be against the manifest weight of the evidence. The circuit court explicitly premised its termination decision on the child's relocation to Arizona. The proposed relocation, however, was not yet authorized—or not yet authorized in the family law case, the only case in which the proposed relocation could be legitimately authorized. The plan to relocate the child from Illinois to Arizona was crucial to the court's decision to terminate the guardianship. The mother now lived in Arizona, and she and the grandfather were the only available caregivers. So, the only options for the child, until the father overcame his criminal law difficulties and achieved stability, were to be relocated with the mother or to continue living with the grandfather. But the availability of relocation was, in a manner of speaking, a fact not in evidence. Whether the child could be relocated was an issue yet to be resolved in the family law case. Treating relocation as a *fait accompli* in the guardianship case was legally and factually unjustified. Under section 609.2 of the Marriage Act, there were procedures to be followed and factors to be considered, and relocation should not have been prejudged.

¶ 10        Because the circuit court lacked statutory authority in the guardianship case to order the relocation of the child, and because the termination of the guardianship was based on the plan to relocate the child, the termination of the guardianship was against the manifest weight

- 4 -

of the evidence. (We do not reach the remaining issues raised in these appeals.) Therefore, we reverse the court's judgment in this guardianship case, and we remand this case with directions to consolidate this guardianship case for hearing and disposition into the family law case, Winnebago case No. 17-F-955, and to hold further proceedings in the family law case not inconsistent with this order.

¶ 11                                    I. BACKGROUND

¶ 12                          A. The Parenting Plan and Allocation Judgment

¶ 13          On February 2, 2016, the child was born to the mother and the father.

¶ 14          On October 13, 2017, in the family law case, the mother petitioned for custody of the child. She named, as the respondent, the father, whose paternity of the child had been established.

¶ 15          On November 2, 2017, in the family law case, the mother and the father signed a document titled "Parenting Plan." According to this document, the mother lived in Machesney Park, Illinois, and the father lived in Loves Park, Illinois. The mother and the father agreed to "provide to the other party at least sixty (60) days prior written notice of the intention to change his or her residence." Such notice was to include, "[a]t minimum," "the intended date of the change of residence and the address of the new residence."

¶ 16          The mother and the father further agreed to the following.

¶ 17          First, in four "Types of Significant Decision Making" regarding the child, the decision making would be "Joint": (1) "Educational," (2) "Medical/Dental/Mental Health," (3) "Religious," and (4) "Extracurricular and Recreational Activities."

¶ 18          Second, the mother and the father would have "equal parenting time under the parenting schedule set forth" in the "Parenting Plan." Specifically, the child would be in the

mother's care on Wednesdays and Thursdays and every other weekend from Friday to Sunday, with drop-offs at 9 a.m. and 9 p.m. The child would be in the father's care on Mondays and Tuesdays and every other weekend, with drop-offs at 9 a.m. and 9 p.m. This "weekday and weekend schedule [would] apply for all 12 calendar months[,] with no specific changes during the summer." In addition, there was a schedule for "Holidays and Special occasions." The "Party starting parenting time" was to "provide transportation."

¶ 19 Third, the mother and the father agreed that "[i]f a parent wishe[d] to relocate the child(ren) from their primary residence, he or she [had to] have the agreement of the other parent or permission from a judge." The term "[r]elocation" was defined to include relocation "[f]rom a primary residence anywhere in Illinois to a new residence out of Illinois[ ] if the move [would] be more than 25 miles from the current residence."

¶ 20 The parent who proposed a relocation had to follow a notice procedure, which was substantially the procedure prescribed in subsections (c) to (g) of section 609.2 of the Marriage Act (750 ILCS 5/609.2(c) to (g) (West 2022)). To quote the parenting plan:

> "(d) The parent seeking to relocate shall provide at minimum sixty (60) days written notice before the relocation unless such notice is impracticable.
>
> At minimum the party must provide the following:
>
> I. The intended date of the party's relocation.
>
> II. The address of the new residence, if known.
>
> III. The length of time the relocation will last if the relocation is not for an indefinite or permanent period."

¶ 21 The relocation procedure then forked into two paths: one path if the nonrelocating parent signed the notice, thereby signifying his or her consent to the proposed relocation, and the

other path if the nonrelocating parent did not consent to the proposed relocation. The parenting plan provided:

"(e) If the non-relocating parent signs the notice provided by the relocating parent and the relocating parent files the notice with the court, the relocation shall be allowed without any further court action. The court shall modify the parenting plan or allocation judgment to accommodate a parent's relocation as agreed by the parties as long as the agreed modification is in the child's best interests. If the non-relocating parent objects to the relocation, fails to sign the notice or the parties cannot agree on modifying the parenting plan or allocation judgment, the parent seeking [relocation] must file a petition seeking permission or [*sic*] relocate."

¶ 22    The same day the mother and the father signed the parenting plan, they filed it in the family law case, and Judge Nordquist entered an order providing as follows: "The Parenting Plan attached hereto is approved by the Court and the parties are ordered to comply with the terms thereof."

¶ 23                    B. The Appointment of a Guardian

¶ 24    On July 1, 2021, in the present case, the grandfather filed a petition to be appointed as the child's guardian. The petition alleged that the proposed appointment would be in best interests of the child because "the parents dropped [the child] off on June 25[.] [T]hey got in trouble [and] haven't been back," and the grandfather "need[ed] to be able to make decisions [and provide] medical [care] for [the child]."

¶ 25    On July 7, 2021, the circuit court held a hearing on the guardianship petition. The mother and the father did not appear at the hearing, although, according to the grandfather's

certificate of service, he had served them by mail. The grandfather appeared *pro se*. After questioning the grandfather under oath, the court entered an order appointing him as the guardian of the child's person. The reason for the appointment, according to the order, was that the child "[did] not have parent(s) ready, willing, and able to carry out the day to day care decisions."

¶ 26     C. The Amended Petition to Terminate the Guardianship

¶ 27   On September 25, 2023, in the guardianship case, the mother filed an amended petition to terminate the guardianship. In the amended petition, she alleged that, since July 7, 2021, when the circuit court appointed the grandfather as the child's guardian, there had been a material change in circumstances. See 755 ILCS 5/11-14.1(b) (West 2022). She claimed she had "turned her life around." Specifically, she met Anthony Filatov in October 2022 and married him on February 22, 2023. They lived in a three-bedroom house on 4.5 acres in Meadview, Arizona. The amended petition did not specify an address, but according to the amended petition, the house included, for the child's use, a "clean bedroom" with its own bath and bathtub. Filatov, a veteran of the United States Navy, worked from home as a litigation specialist and was able to financially support the mother and the child. The mother, who was unemployed, volunteered at the local Veterans of Foreign Wars as a cook.

¶ 28   The amended petition further claimed a material change in the child's circumstances (see *id.*), in that the child allegedly had been denied a relationship with the mother and had not been provided dental care and "the appropriate education and medical care."

¶ 29   The prayer for relief was not only that the guardianship be terminated but also that the mother "be awarded custody of [the child] and that she be able to relocate with the *** child to the State of Arizona." This request for relocation was new. It was not in the previous version of the petition for termination of the guardianship.

¶ 30          The record appears to contain no proof of service of the amended petition for termination of the guardianship. On the day the amended petition was filed, there was a status hearing. At the end of the hearing, after the mother and the grandfather agreed that a trial on the original petition for termination of the guardianship would be held on November 27, 2023, November 29, 2023, and December 1, 2023, the mother's attorney mentioned that she "filed an amended petition today too." The circuit court said, "Okay."

¶ 31                              D. Petitions in the Family Law Case

¶ 32          On November 9, 2023, in the family law case, the father filed a document titled "Emergency Petition to Modify and Restrict Allocation of Parental Responsibilities—Decision Making and Parenting Time." (The record in this guardianship case includes some of the documents filed in the family law case.) He claimed that, "since entry of the Order incorporating the parties['] parenting plan *** on November 2, 2017," there had been a "substantial change in circumstances." One change, according to the petition, was that the father would be released from jail on December 1, 2023. Another change, which the father alleged on "information and belief," was that the mother was "trying to relocate with the minor child to the State of Arizona." Still other changes were various alleged shortcomings of the mother. Because of those alleged shortcomings, the father invoked section 603.10 of the Marriage Act (750 ILCS 5/603.10 (West 2022)), requesting that the circuit court

                    "B. Enter an Order restricting and/or suspending [the mother's] parenting
              time.

                    C. Enter an Order granting [the father] sole decision making for [t]he
              minor child.

                    D. Enter an Order prohibiting [the mother] from relocating the minor child

- 9 -

to the State of Arizona."

¶ 33        On November 27, 2023, in the family law case, the mother filed a document similarly titled "Petition for Modification of Allocation of Parental Responsibilities—Decision Making and Parenting Time and for Restricted Parenting Time." This petition pointed out that, "[o]n November 14, 2023, [Judge] Nordquist ruled that this matter should be consolidated with [the guardianship case] and that further proceedings in this case are to be heard by the Honorable Gwyn Gulley." We observe that, according to the Winnebago County circuit court's website, of which we may take judicial notice (see *In re F.P.*, 2014 IL App (4th) 140360, ¶ 39), the docket entry for November 14, 2023, in the family law case reads, "Cause Continued for Hearing with Judge Gulley Alongside the [guardianship case] that was previously set." The mother noted in her petition for modification:

> "A proposed order setting forth Judge Nordquist's decision following the November 14, 2023, court appearance was se[n]t by [the mother's] counsel to [the father's] counsel on November 15, 2023, and a revised proposed Order was sent by [the mother's] counsel to [the father's] counsel on November 20, 2023, but neither proposed Order has been approved by [the father's] counsel and neither Order has been entered yet by the Court."

¶ 34        The mother's petition continued that, since the entry of the order incorporating the parenting plan, a substantial change in circumstances had occurred in that (1) the mother had married Filatov and had moved to Arizona and (2) the father had allegedly misbehaved in a variety of ways and had displayed numerous shortcomings. Therefore, the petition requested the entry of an order

> "C. Granting the [mother] sole decision-making authority for all major

- 10 -

decisions regarding the parties' minor child.

> D. Granting the [mother] the majority of the parenting time with the minor child.

> E. Designating the [mother] as the custodial parent for the parties' minor child.

> F. Restricting any parenting time between [the father] and the parties' minor child."

¶ 35    Also on November 27, 2023, in the family law case, the mother filed a document titled "Petition for Temporary and Permanent Relocation." In this petition, she requested that the circuit court (1) "grant [her] the ability to remove the *** child to the State of Arizona on a temporary and permanent basis" and (2) "[e]nter an appropriate restricted parenting time order for parenting time between the [father] and the *** child."

¶ 36    On May 28, 2024, according to the circuit clerk's website, the circuit court appointed Maureen M. Lawson as the guardian *ad litem* in the family law case—the same attorney who was the guardian *ad litem* in the guardianship case.

¶ 37                    E. A Hiatus in Contact and Visitation

¶ 38    On June 7, 2023, the circuit court entered an order granting the mother one week of parenting time, from June 12, 2023, at 10 a.m., to June 19, 2023, at 7 p.m. The mother and Filatov traveled from Arizona to Illinois, towing a camper, for the one week of visitation.

¶ 39    On June 29, 2023, the mother moved for an order terminating the guardianship or, alternatively, for more parenting time.

¶ 40    On August 8, 2023, the circuit court ordered that, from August 4, 2023, onward, the mother was to have parenting time every other weekend from Friday at 5 p.m. until Sunday

at 5 p.m. The court further ordered that the mother was to be allowed phone calls, video calls, or both with the minor, outside the presence of the grandfather and his wife and without interference by them. The mother and Filatov stayed in Illinois, living in the camper on the mother's grandmother's property in Rockford, so that the mother could exercise her right to the additional parenting time.

¶ 41　　　　At trial, the guardian *ad litem* was asked why the mother and Filatov lived in the camper instead of with a family member. She answered:

> "I was told the reason is because [the mother] had stolen, you know, during the time that she had issues with drugs, she had stolen from her grandmother, and so her grandmother didn't want her in that home, in her home at night, I guess, because she did in the past steal from her grandma."

¶ 42　　　　On November 17, 2023, the mother's parenting time was temporarily suspended when, in Winnebago County case Nos. 23-OP-2956 and 23-OP-2957, the grandfather was granted emergency orders of protection against the mother and Filatov. The reason for these orders was that a neighbor reportedly had seen Filatov shove the child at Carlson Ice Arena in Rockford.

¶ 43　　　　The guardian *ad litem* interviewed the child about this incident at the ice skating rink. The child told her that when he went to greet a friend of his, a boy named Jaden, Filatov "grabbed [the child] and shoved him out of the way[ ] because he didn't want him to talk to Jaden." The mother then said, either to Jaden or to somebody who was with Jaden, " [']What the F*** are you looking at[?'] " This incident "scared" the child (he recounted to the guardian *ad litem*). The child explained to the guardian *ad litem* "that [the mother] and [Filatov] didn't want him to be around Jaden while they were at the skate park, and that [the mother] doesn't

want him to be around his friends." The guardian *ad litem* testified to her perception that the child was close to his friends.

¶ 44    On December 18, 2023, the emergency orders of protection against the mother and Filatov were rescinded because the circuit court found no substantial likelihood of irreparable harm or continued abuse.

¶ 45    In December 2023, purportedly because the mother was frightened by the order of protection proceedings, she and Filatov drove back to Arizona. At trial, the guardian *ad litem* was asked:

> "Q. Okay. You're shaking your head. Do you believe what [the mother] reported to you as her reason why she moved to Arizona?
>
> A. No. Because I don't understand what she would be afraid of. The emergency order was vacated. I don't understand. But she reported that she was afraid that she would get in trouble, so she went back to Arizona."

¶ 46    Because the mother was pregnant at the time of this return trip to Arizona, the drive back was arduous for her, according to her testimony. She did not feel up to further travel.

¶ 47    The mother testified that on December 19 or 20, 2023, after she and Filatov returned to Arizona, she asked the grandfather's attorney if the child might come to Arizona during the winter break. Because "it was not good for [the mother] to have all that travel time being pregnant" (to quote her testimony), she asked if her mother or sister or Filatov could pick the child up after school on Friday, when the mother's parenting time was scheduled to begin. The grandfather's attorney agreed to allow the child to go to Arizona for a visit but insisted that the mother personally pick up the child.

¶ 48    Because the mother had found that traveling while pregnant was a "very rough

ride," the Arizona visit did not happen during the winter break in 2023. Contact between the mother and the child then fell off. The mother called the child on his birthday, February 2, 2024, but she sent him no birthday present, and, in 2023, she sent him no Christmas gift.

¶ 49          The guardian *ad litem* was asked:

"Q. [The mother has] been able to exercise her parenting time since December 18th of '23, correct?

A. Correct.

Q. And it's April 1st of '24?

A. Correct.

Q. And is it correct that she's not exercising her parenting time since that time?

A. Yes.

Q. Are you aware that [the mother] doesn't call [the child] since December 18th, except for twice?

A. That's what [the child] told me, yes.

Q. How does this make—did [the child] express any feelings about his mom going back to Arizona?

A. Yeah. He is very angry.

Q. Okay. Based on that, do you believe that—do you believe that [the child] would do well with [the mother] alone in Arizona?

A. I know he doesn't want to go. I know he's hurt. I know he feels that his mother just goes in and out of his life. I think he feels that nothing has changed with her. So now he feels that she's unsafe. And that [the child] remembers his

- 14 -

mom when she had a drug problem, right."

¶ 50          F. The Motion for Consolidation in the Guardianship Case

¶ 51          On November 22, 2023, in the guardianship case, the mother filed a motion titled "Motion to Consolidate." In this motion, she informed the circuit court that, on November 14, 2023, in the family law case, Judge Nordquist "ruled that the family [law] case should be consolidated with the guardianship case and that further proceedings in the family [law] case are to be heard by [Judge] Gulley."

¶ 52          The motion further noted that, in Winnebago County case Nos. 23-OP-296 and 23-OP-297, in response to petitions by the grandfather, the circuit court had issued emergency order of protections against the mother and Filatov (which, as we have noted, were soon afterward rescinded).

¶ 53          The motion for consolidation argued:

          "10. The guardianship case, the family [law] case and the two orders of protection cases all involve the same minor child, the same subject matter, and similar issues.

          11. A consolidation of all of the cases would not prejudice either party.

          12. In the interest of judicial economy, the cases should be consolidated."

Although the motion argued that the guardianship case, the family law case, and the order of protection cases all should be consolidated, the concluding paragraph of the motion merely requested "an Order consolidating [the order of protection cases] with [the guardianship case]."

¶ 54          On November 27, 2023, in the guardianship case, the circuit court heard the motion for consolidation. The mother's attorney argued that "Judge Nordquist had granted the motion to consolidate" and that the court likewise should consolidate the two order of protection

cases with the guardianship case. The following exchange occurred:

"THE COURT: But that is not consolidated with these cases.

MS. HUNT [(THE GRANDFATHER'S ATTORNEY)]: That's correct. They filed a motion to consolidate. They set it down for today. They are asking that the F case and the OP case be consolidated in front of [Y]our Honor.

The OP case is set to be heard in front of Judge Bruscato on their motion to vacate or reconsider 8:30 on Thursday.

\*\*\*

THE COURT: Which can still be heard by Judge Bruscato. We don't necessarily have to consolidate the OP with this case.

MS. EPSTEIN [(THE MOTHER'S ATTORNEY)]: The only problem is, of course, then she can't take the child. That is the whole purpose, right? The whole purpose is to do whatever they can to make sure that she can't have her child after like nine months of being up here. That is what the whole purpose of this is.

THE COURT: Right, that is why—it is my thought that we need to deal with the guardianship issue—

MS. EPSTEIN: Let's do it.

THE COURT: —and then all these other issues may fall in place or they may be separate issues.

MS. EPSTEIN: Okay. Understood.

MS. HUNT: So as it relates to their part of that motion, their motion to consolidate, is their request to consolidate 2023 OP 2956 and 2023 OP 2957

denied?

> THE COURT: Uh-huh."

¶ 55        At this hearing, Judge Gulley also declined to hear the family law issues. She possessed a draft of the proposed order of consolidation, which she at first mistakenly thought that Judge Nordquist had signed:

> "You know, I am thinking about this consolidation order. I mean, he signed it and he says once the guardianship issues are resolved, then it is transferred back to him.
>
> MS. HUNT: That is why I said he didn't actually consolidate it. He referred to you to handle the probate matter.
>
> THE COURT: But I am not going to handle it, that is the—it makes no sense.
>
> MS. HUNT: I know.
>
> THE COURT: I mean, to me, because the only thing I am hearing is the guardianship case, so—
>
> MS. HUNT: That's correct.
>
> THE COURT: There is really no need for it to be consolidated.
>
> MS. EPSTEIN: Okay.
>
> THE COURT: Do you understand what I am saying?
>
> MS. EPSTEIN: Yeah, I do.
>
> MS. HUNT: Yes.
>
> THE COURT: Because we're not dealing with the F case or any issues regarding the F case. So if it is consolidated, it is just kind of hanging out there.

And if you sub me—

MS. EPSTEIN: I gotcha.

THE COURT: —there is really no—I get the sub. So even if it were to go back to him, you know, it is still going to be his case and I am just handling the guardianship cases.

MS. EPSTEIN: Right.

MS. HUNT: So are you denying their motion to consolidate then? Because what I am representing to the Court is that Judge Nordquist did not consolidate the cases.

THE COURT: Did he sign this order?

MS. HUNT: No.

MS. EPSTEIN: No.

THE COURT: There is a dispute over the order, which is why I had ordered the trial transcripts this morning when I walked in and saw the motion to consolidate.

MS. EPSTEIN: That's okay. We will just keep it.

THE COURT: Well, I mean, I just want to make sure it is clear for the record because—

MS. HUNT: Yes, Judge.

THE COURT: You know, because I am not hearing anything on the F case. You subbed me on that case because—which there really wasn't a reason to sub me because I am not hearing anything on it.

MS. EPSTEIN: Okay.

MS. HUNT: It was my understanding that you had granted Attorney Epstein's motion to consolidate the F case with the P case. That is why I *instanter* filed the motion to sub.

THE COURT: And that was because, and like I was explaining on the record, we're just dealing with the guardianship case. I don't have anything to do with the F case.

MS. EPSTEIN: I am okay.

THE COURT: So for whatever reason it needs to follow, and sometimes there are issues like if somebody is asking for child support or something. That is not what we're doing here. We're just—it is whether I need to decide whether to terminate the guardianship. I don't have anything to do with the F case and it is unlikely that I would. So I would say I am not granting that consolidation.

MS. EPSTEIN: Okay. No problem.

THE COURT: So that way it is clear.

MS. HUNT: So you want your order to say motion to consolidate denied.

THE COURT: Is denied, yes.

MS. HUNT: Okay.

THE COURT: That way the F case is still there. When we're done with this—

MS. EPSTEIN: Yep.

THE COURT: —just like he says, it should come back to him because it should, and then there is no need for your motion to sub.

MS. HUNT: Okay.

THE COURT: Okay."

¶ 56           On December 13, 2023, in the guardianship case, Judge Gulley followed up with a written order, stating: "Over [the mother's] objection, [the mother's] Motion to Consolidate is heard and denied."

¶ 57           G. The Oral Ruling on the Amended Petition to Terminate the Guardianship

¶ 58           On May 23, 2024, in the guardianship case (with Judge Gulley presiding), the circuit court orally announced it had decided to grant the mother's amended petition to terminate the guardianship. The court found a material change in circumstances in that the mother "appear[ed] to have turned her life around." She no longer pursued her "previous lifestyle of crime and drug use and instability." She had moved to Arizona, had married Filatov, and was expecting a child. According to the mother's testimony, she and Filatov had a stable living environment, and Filatov provided for her financially so that she did not have to work.

¶ 59           The father, by contrast, had continuing difficulties with the criminal law system. The grandfather's wife, Jessica Bagnall, had testified that there were outstanding warrants for the father's arrest, in multiple counties, for theft.

¶ 60           After finding that the mother had materially changed her previous circumstances of drug abuse and criminal misconduct, the circuit court turned its attention to the grandfather's case. The court found that the grandfather had failed to prove, by clear and convincing evidence, that keeping the guardianship in force would be in the best interests of the child. The court did not believe that the grandfather would facilitate visitation. The grandfather had obtained emergency orders of protection against the mother and Filatov, but soon afterward the orders were rescinded. The court suspected that the order of protection proceedings had been a ruse to frustrate the mother's visitation of the child.

¶ 61		Although the child did not want to move to Arizona and preferred to continue living with the grandfather, the circuit court chose not to give much weight to the child's wish, considering that the child was only eight. The court noted evidence that the child enjoyed visiting the mother. The court concluded it would be in the best interests of the child that the child be relocated to Arizona, to live with the mother and Filatov and to attend school in Arizona. The court found that the grandfather had failed to prove, by clear and convincing evidence, that termination of the guardianship would not be in the best interests of the child.

¶ 62		The grandfather's attorney then alerted the circuit court that, in the family law case, there was "a petition for relocation that hasn't been decided," as well as a petition to enjoin the proposed relocation.

¶ 63		The following exchange then took place:

> "MS. EPSTEIN: Judge, we can't—Judge Nordquist sent it to you, okay, again because this is what's going to happen: We're going to end up going back there and they're going to file a motion, which they've been doing. Every time we leave you, they go up there and file a motion to prevent us from doing something else, and now you—
>
> THE COURT: But Judge Nordquist is going to be aware of my decision—
>
> MS. HUNT: That's correct—
>
> THE COURT: —to allow—
>
> MS. HUNT: —yeah.
>
> THE COURT: —the minor to relocate, so I doubt—
>
> MS. EPSTEIN: Okay.
>
> THE COURT: It is highly unlikely that he's going to go against that, but I

don't know.

So file whatever—

* * *

MS. HUNT: So the relocation issue is going to be litigated with Judge Nordquist.

THE COURT: Okay.

MS. HUNT: Okay.

MS. EPSTEIN: Oh, no, we asked for it. We asked—our prayer for—to be able to relocate to Arizona. You can order that, Judge. You're able to order that.

THE COURT: Well, that's what I've ordered.

MS. EPSTEIN: Yeah. Okay. So then I think Ms. Hunt and I—is saying that you're not ordering that.

THE COURT: No, that's—that's what I—I mean, this is what I said. The child is going to be going to school in Arizona, so—

MS. EPSTEIN: Okay.

THE COURT: —clearly that's my decision."

The court requested that the mother's attorney draft an order reflecting the oral judgment.

¶ 64          H. The Motion to Stay Enforcement of the Judgment

¶ 65          On June 4, 2024, in the guardianship case, the grandfather filed a document titled "Motion to Stay Enforcement of Judgement [*sic*]." In this motion, he pointed out that petitions to modify the allocation of parental responsibilities were pending before Judge Nordquist in the family law case, in which the grandfather had moved to intervene. The grandfather requested that, in the guardianship case, the circuit court "stay[ ] the enforcement of the Court's order to

terminate the guardianship, and as to relocation, school enrollment, and parenting time, and that the court maintain the status quo pending further orders by Judge Nordquist as to intervention, parental allocation[,] and relocation."

¶ 66    I. The Entry of the Written Order Terminating the Guardianship

¶ 67    On June 5, 2024, in the guardianship case, the circuit court entered an order titled "Order Terminating Guardianship." In this order, the court found that the mother had proven, by a preponderance of the evidence, that, since the establishment of the guardianship, her circumstances had materially changed. The court further found that the grandfather had failed to carry his burden of proving, by clear and convincing evidence, that termination of the guardianship would not be in the best interests of the child. Therefore, the court discharged the grandfather from his position as guardian and revoked his letters of office.

¶ 68    But the order did not stop there. It further provided for the relocation of the child to Arizona, subject to a transitional period of visitation with the grandfather:

"D. [The child] shall reside with [the mother] in the State of Arizona.

E. [The mother] shall register [the child] for school commencing in July of 2024 in the State of Arizona.

F. [The child] shall complete his second grade education this school year at Windsor Elementary School until his last day on May 31, 2024.

G. [The child] shall stay with [the grandfather] until May 31, 2024.

H. [The mother] shall communicate with the school to enable her grandmother, Rose Zadek, to pick up [the child] from Windsor Elementary School on May 31, 2023 [*sic*], at 2:30 p.m. or at such time when [the child's] school day ends on May 31, 2024. ***

- 23 -

I. [The mother] shall arrange for [the child] to be escorted by her grandmother by airplane, or other transportation, from the State of Illinois to the State of Arizona on or after May 31, 2024.

J. [The child] shall be in [the mother's] care after May 31, 2021 [*sic*] at 2:30 pm with the exception of one transition period for [the child] with [the grandfather] commencing June 29, 2024 at 9:00 am until July 6, 2024 at 6:00 pm so the minor child may vacation in Door County, Wisconsin with [the grandfather].

K. [The mother] or her grandmother, shall bring [the child] to [the grandfather's] residence located [in] Loves Park, Illinois at 9:00 am on July 6, 2024 [*sic*].

L. [The mother] or [her] grandmother shall pick [the child] up on July 6, 2024 at 6:00 p.m[.] at [the grandfather's residence]. [The grandfather] shall make the child available at that time."

¶ 69    J. The Joint Motion to Reconsider and Vacate the Judgment

¶ 70    On June 12, 2024, in the guardianship case, the grandfather and the father filed a document entitled "Joint Motion to Reconsider and Vacate June 5, 2024 Judgment." In support of their request that the circuit court vacate the termination of the guardianship, they alleged numerous errors. They requested that, pursuant to section 2-1203(b) of the Code (735 ILCS 5/2-1203(b) (West 2022)), the court "[s]tay enforcement of the judgment pending ruling on this Motion."

¶ 71    K. The Grandfather's Petition to Intervene in the Family Law Case

¶ 72    On May 28, 2024, in the family law case, the grandfather petitioned to intervene.

He also filed an emergency petition for the allocation of parental responsibilities and an emergency petition for injunctive relief.

¶ 73       On June 11, 2024, Judge Nordquist held a hearing on the grandfather's petitions. At the hearing, the attorneys for the mother, the father, and the grandfather appeared. The guardian *ad litem* also appeared.

¶ 74       The grandfather's attorney argued that although, on June 5, 2024, the circuit court entered an order terminating the guardianship, the grandfather still had "an unconditional right to intervene" under section 2-408(a)(1) of the Code (*id.* § 2-408(a)(1)) and section 601.2 of the Marriage Act (750 ILCS 5/601.2 (West 2022)). The grandfather's attorney continued:

> "So what I'm asking from the Court is twofold: One, grant my petition to intervene and grant the petition for injunctive relief preventing [the mother] from relocating [the child] outside of the State of Illinois. She already has petitions pending to relocate which are set before you as well as a petition to modify the allocation of parental responsibilities, and so we need the guardian *ad litem* to do an investigation into all the pending motions and make a recommendation and ultimately set this case for trial."

¶ 75       The father's attorney agreed that the grandfather, with whom the child had lived all his life, had a right to intervene.

¶ 76       The mother's attorney disagreed. She argued that because the circuit court had terminated the guardianship, the grandfather lacked standing and that his interference should be put to an end. She complained, "[E]very time Judge Gulley makes a ruling, then they bring the case in front of Your Honor to circumvent her rulings." The mother's attorney argued that the mother should have custody of the child. The father was "in jail," the mother's attorney

observed, and the mother "now has the child restored to her." The grandfather, however, "doesn't like the decision in Judge Gulley's courtroom so now he's filing all these motions here trying to intervene."

¶ 77       The grandfather's attorney responded, "Judge Gulley already made the decision regarding the guardianship. That's all she has jurisdiction over. You [(Judge Nordquist)] have jurisdiction over custody."

¶ 78       Judge Nordquist then turned to the guardian *ad litem*, asking her to "do a report to the Court what's going on there and then we can go forward."

¶ 79       The guardian *ad litem* explained:

"It's my understanding that the guardianship has been terminated. So under the law once a guardianship is terminated, then that case is closed. Judge Gulley did not elect to take the family [law] case so it is before you, Your Honor, so it is for you to determine the allocation of parental responsibilities as well as the motion to intervene by the grandparents.

[The child] has not seen [the mother] since before Christmas because she voluntarily chose to go back to Arizona. [The child] has never been to Arizona, is very upset about why [the mother] left Illinois and stopped seeing him. I do not think it's in the child's best interest [that the] child be sent to Arizona yet. This Court needs to decide the intervention—you know, whether or not the grandparents are going to intervene and whether or not [the mother] can relocate. So while that's pending, I believe [the child] should remain here and should be put back with the grandparents instead of with this relative that the child doesn't really know very well."

¶ 80    The following exchange then occurred:

"THE COURT: Is there still pendings [*sic*] in the probate court with Judge Gulley? Is there something still pending there?

MS. EPSTEIN: Yes; a motion to stay the enforcement of the judgment. I got to respond to that. ***

* * *

MS. CHUDOBA [(THE FATHER'S ATTORNEY)]: The only thing left before Judge Gulley is a motion to stay. *** [I]t has to go back to your court because she chose not to consolidate the two cases. She then stepped back and said she would look at the motion to stay but said that she had to revert to you. She knew that this was up before you next and perhaps you would consider her thought process, but it is in your court and your jurisdiction to determine what happens with the child now.

I'd ask that you follow the direction of the [guardian *ad litem*] because you have to decide based on the best interests of the child and that's what she's here for and she's telling you what she believes is in his best interest right now."

¶ 81    Judge Nordquist decided to keep the status quo pending further arguments, and the following exchange occurred:

"THE COURT: All right. I'm going to keep the status quo as to what was going on based upon the report from the guardian *ad litem* over objection of everybody here maybe and that is that the child stay here in Rockford, Illinois.

* * *

MS. EPSTEIN: The status quo of what Judge Gulley said or what you're

saying now? There's a difference.

THE COURT: That the child be with grandpa and that—

MS. EPSTEIN: The child is not with grandpa.

THE COURT: The child is staying here in Rockford, Illinois. Whoever the child has been living with primarily over the last year—the child stays here. Okay? And then we'll sort all this stuff out. You can do it in probate court and you can come back and do it in the family court, but I'll give you time to do all that but we're going to keep the status quo here.

MS. EPSTEIN: Wait—

(Simultaneous speaking.)

THE COURT: Don't argue. I'm going to give you a date to come back so I can see what's going on, but the child stays here.

\* \* \*

MS. EPSTEIN: I don't understand.

THE COURT: I'm going to direct that Attorney Hunt prepare that order.

\* \* \*

MS. EPSTEIN: Judge, you're overruling Judge Gulley's decision.

\*\*\*

THE COURT: I guess—that's what I'm doing. Sorry.

\* \* \*

MS CHUDOBA: May the order reflect that the transfer happen today at 5:00 p.m. at Loves Park?

THE COURT: Yes. That is all for today."

¶ 82                              L. The Hearing on the Motion for a Stay

¶ 83          On June 14, 2024, in the guardianship case, Judge Gulley held a hearing on the

"Motion to Stay Enforcement of Judgement [*sic*]." In denying the request for a discretionary

stay, she reasoned:

> "Pursuant to section 755 ILCS 5/11-14.1 of the Probate Act, the Court has
>
> jurisdiction to terminate guardianship and did so allowing the parties to be
>
> heard after multiple days of hearing. The Court reached the difficult decision after
>
> consideration of the evidence presented, the credibility of the witnesses, and
>
> thorough consideration of the best interest factors of [the child]. Those factors are
>
> similar to those in the [Marriage Act]. At no time did [the] father appear as a
>
> witness or file any pleadings before this Court. The grandparents were
>
> present and had the opportunity to be heard. The petition sought termination as
>
> well as custody. When the Court terminates guardianship, the minor has to be
>
> placed somewhere, and in this case the parent seeking termination resides in
>
> Arizona. [The father] did not offer any opinion as to whether he was in favor of
>
> the termination. The grandparents did not meet their burden under the Probate Act
>
> to show that it was not in [the child's] best interest to return him to the mother."

¶ 84          Thus, in the guardianship case, the circuit court denied the grandfather's motion

for a discretionary stay. The court memorialized the denial in a written order entered that same

day. Paragraph 4 of the order provided, "The child is allowed to be transported to Arizona by

[the mother's grandmother,] Rose Marie Zadek[,] on June 14, 2024, or 6/15/24 and returned by

June 28, 2024[,] with pick-up to be done by [the child's paternal grandmother,] Jessica Bagnall[,]

from the Las Vegas Airport."

¶ 85    M. The Hearing on the Motion to Reconsider and Vacate the Judgment

¶ 86    On June 26, 2024, in the guardianship case, Judge Gulley held a hearing on the grandfather and father's "Joint Motion to Reconsider and Vacate June 5, 2024 Judgment." At the hearing, the father's attorney argued:

> "All the Court needed to do was terminate the guardianship and turn the child over, and after that the issue between the parties as far as where the child goes, where he lives, where he goes to school, whether or not he can go temporarily to Arizona, those are issues before the family law court."

¶ 87    Judge Gulley responded that she had to require that the child be turned over to someone if she terminated the guardianship. She acknowledged that there was a family law case. She said, however, "[I]f they want it to be permanent, that's where they deal with it. That's not part of my ruling, that it's a permanent—That was not my decision that it was a permanent relocation."

¶ 88    "But, [Y]our Honor," the father's attorney said, "you ordered the child to live in her—to be in her sole care and to be enrolled in school in Arizona." What Judge Gulley could do alternatively, the father's attorney argued, is "order the child to be turned over to [the mother] at the police station" and then allow Judge Nordquist to decide the remaining issues in the family law case. "[B]ut I was not making it a permanent decision," Judge Gulley replied—the child "had to be turned over to the mother," who "just so happened to be *** residing in Arizona." The following exchange then occurred:

> "THE COURT: Well, I—I believe I did have the authority to have the child go with [the mother] to Arizona; so, again, that was my ruling; and that's why, you know, I considered best interest and that was my ruling.

MS. CHUDOBA: But not under the Marriage Act.

THE COURT: I'm—I was—Under the Probate Act, which I—I do daily. I do it daily. Okay.

MS. CHUDOBA: Even if two cases are consolidated, a family law case and a probate case—

THE COURT: But, again, ultimately—Again, the family, [the mother] and [the father], just like [the grandfather] said, ['L]et them hash it out in family court.['] They will certainly do that. But right now because [the mother] was the one that stepped before this Court and said, [']hey, I want my child back[']—[the father] didn't do that. [The mother] did it. So [the mother]—I ruled in her favor. [The mother] happens to reside in Arizona. So that's where the child goes until Judge Nordquist decides if that's a permanent situation or just, you know, the child needs to be returned. That's his decision."

¶ 89    Observing that there was "already a parental allocation judgment," the father's attorney said she did not "understand why the probate order [was] trying to modify that when there's already a judgment."

¶ 90    The following exchange then occurred:

"THE COURT: Well, I wasn't trying to modify anything. I was just making the rulings that were before the Court. So I was not trying to step into Judge Nordquist's shoes.

MS. CHUDOBA: I understand, but the result of the child being enrolled in Arizona equates to almost a permanent relocation. The child—You're ordering— Under the Marriage Act the child can't be enrolled in school in Arizona unless

- 31 -

there's a relocation petition that modifies the parties' allocation judgment. So the ordering of the child to be enrolled in school in Arizona is a modification of that judgment. It was not done under the Marriage Act. Does [Y]our Honor understand what I'm saying?

> THE COURT: No. I understand exactly what you're saying. But, again—
>
> MS. CHUDOBA: Okay.
>
> THE COURT: —this was on a temporary basis because [the mother] is in Arizona.
>
> MS. CHUDOBA: I understand. Enrollment in school though I don't view as temporary.
>
> THE COURT: Okay. All right."

¶ 91    At the conclusion of the hearing, Judge Gulley said she would take under advisement the motion to reconsider and vacate the judgment.

¶ 92    The father's attorney then attempted to sum up, "So it's my understanding the child is supposed to be turned over back to [the grandfather] on the 28th. *** [W]e also have an order from Nordquist that the child is supposed to be returned to [the grandfather]."

¶ 93    The mother's attorney complained:

> MS. EPSTEIN: Do you believe that? Like status quo. Return to [the grandfather]. So now we're going back to [the grandfather]. After we leave here, we're going to go back up there because they're going to say the child has to be returned to [the grandfather]; now we're not going to return him. See."

¶ 94    The father's attorney rejoined that "[t]he family law court has jurisdiction to make continuing rulings regarding this child as far as parental allocation" and that "Judge Gulley

cannot reconsider Judge Nordquist's order." Judge Gulley agreed—"just like he can't reconsider mine." She noted that neither she nor Judge Nordquist was "the Appellate Court."

¶ 95    The mother's attorney said:

> "I need an order from you, Judge, saying that the child—today that the child goes back to [the mother] on July 6th and how it's going to happen. Because right now they got Judge Nordquist's order in between your orders and they're going to say that's the one in effect."

The father's attorney responded, "I'm not sure under what jurisdiction the Court could enter another order."

¶ 96    Judge Gulley declined to enter a new custody order, but she made a *nunc pro tunc* correction to her judgment order of June 5, 2024. Paragraph K, on the final page of the order, read that the mother or her grandmother was to bring the child to the grandfather's residence "on July 6, 2024." Judge Gulley changed that date to "6/28/2024" so that paragraph K would be consistent with the rest of the order. The gist of the order as a whole was that there was to be a "transition visitation period" with the grandfather from "June 29, 2024[,] at 9:00 am until July 6, 2024[,] at 6:00 pm," to quote paragraph J. Then, according to paragraph L, the mother or her grandmother was to pick up the child from the grandfather's residence at 6 p.m. on July 6, 2024. Thus, the correct beginning date of the transitional visitation period, in accordance with the rest of the order, was June 28, 2024 (or, more precisely, June 29, 2024), not July 6, 2024, as paragraph K incorrectly said. On the corrected order, Judge Gulley wrote that the change to paragraph K was "*nunc pro tunc* 6/14/24" (which, perhaps, should have been June 5, 2024, when she originally signed the order).

¶ 97    N. The Entry of a Conflicting Order in the Family Law Case

¶ 98        On June 11, 2024, in the family law case, a docket entry was made that reads as follows: "Order to be submitted by counsel, minor to stay in Illinois with [the grandfather]."

¶ 99        A docket entry for June 25, 2024, likewise reads:

>       "Order: minor to stay in Illinois with [the grandfather]. Additional terms of this order are set forth herein.
>
>       Cause continued.
>
>       See order filed."

This "order filed" in the family law case does not appear to be in the record on appeal.

¶ 100        O. The Denial of the Motion to Reconsider and Vacate the Judgment

¶ 101        On July 17, 2024, in the guardianship case, the circuit court entered an order providing, "The Joint Motion to Reconsider and Vacate June 5, 2024[,] Judgment filed on or about June 12, 2024[,] is heard and denied for reasons stated on the record."

¶ 102                            P. The Appeals

¶ 103        The grandfather filed his notice of appeal in the guardianship case on July 25, 2024, and an amended notice of appeal on August 1, 2024.

¶ 104        The father filed his notice of appeal in the guardianship case on July 31, 2024.

¶ 105                            II. ANALYSIS

¶ 106                            A. Our Jurisdiction

¶ 107        Even if the parties do not question our jurisdiction, we have a duty to make sure that we have jurisdiction over the appeal. See *Ontiveroz v. Khokar*, 2025 IL 130316, ¶ 1. Every final judgment in a civil case is appealable as of right. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994). "A final judgment is a determination by the court on the issues presented by the pleadings which ascertains and fixes absolutely and finally the rights of the parties in the lawsuit." *Big Sky*

*Excavating, Inc. v. Illinois Bell Telephone Co.*, 217 Ill. 2d 221, 232-33 (2005). To fix absolutely and finally the rights of parties, the judgment being appealed must still be in effect.

¶ 108   The father and the grandfather appeal Judge Gulley's order of June 5, 2024, in the guardianship case: an order in which she (1) terminated the guardianship and (2) gave the mother permission to relocate the child to Arizona. Is that order still in effect?

¶ 109   On June 11, 2024, in the family law case, Judge Nordquist "overrul[ed]" Judge Gulley's order. He ordered that the child was to remain with the grandfather. When Judge Nordquist spoke, it was the circuit court speaking, just as when Judge Gulley spoke, it was the circuit court speaking. On June 11, 2024, then, the court changed its mind about terminating the guardianship and allowing the child to be relocated to Arizona. The court "overrul[ed]," or vacated, the termination of the guardianship and the granting of permission to relocate the child.

¶ 110   On June 25, 2024, in the family law case, Judge Nordquist entered a written order that the child was to remain with the grandfather.

¶ 111   On July 17, 2024, though, in the guardianship case, Judge Gulley denied a motion by the father and the grandfather to vacate her order of June 5, 2024. Thus, the circuit court changed its mind again: the order of June 5, 2024, was not vacated after all. The latest word, it appears, is that the order of June 5, 2024, still stands.

¶ 112   Therefore, we conclude that we have jurisdiction over these appeals. The order that the father and the grandfather appeal still exists—it is still in force. See Restatement (Second) of Judgments § 15 (1982) ("When in two actions inconsistent final judgments are rendered, it is the later, not the earlier, judgment that is accorded conclusive effect in a third action under the rules of *res judicata*.").

¶ 113   B. An Explanation for Our Delay in Issuing This Disposition

¶ 114 We note that this case is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). That rule obliged us to issue our decision within 150 days after the filing of the notice of appeal unless we had good cause for delay. See Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). In this case, we were required to issue a decision by December 23, 2024, a deadline we missed. The delay is attributable, however, to the appellants' motion for an extension of time to file the record on appeal, the grandfather's motion for an extension of time to file his opening brief, and the mother's motion for leave to file her appellee's brief late. Because of those delays, this case was not submitted for our review until December 19, 2024, when the grandfather filed his reply brief. Oral argument was held on February 25, 2025. Given the delays, which we could not avoid, we find that we had good cause for issuing our decision after the 150-day deadline.

¶ 115 C. A Consolidation That Never Quite Happened

¶ 116 On November 14, 2023, in the guardianship case, over which Judge Nordquist presided, the following docket entry was made: "Cause Continued for Hearing with Judge Gulley Alongside the [guardianship case] that was previously set." This docket entry appeared to order a consolidation of the family law case into the guardianship case.

¶ 117 On November 27, 2023, however, Judge Gulley effectively rescinded that consolidation order, ruling that she would handle only the guardianship case, not the family law case.

¶ 118 This undoing of the consolidation of the family law case into the guardianship case was unfortunate. The actions in the two cases needed to be decided together. Because Judge Gulley's decision to terminate the guardianship was explicitly premised on the child's relocation to Arizona with the mother, the termination of the guardianship was ill-founded without

simultaneous rulings in the mother's favor on her petitions in the family law case, *i.e.*, her petitions for relocation and for modification of the parenting plan and allocation judgment.

¶ 119          D. The Limited Relief Available in the Guardianship Case

¶ 120          If someone has been appointed as a minor's guardian, a parent of the minor may petition for the termination of the guardianship. Section 11-14.1(b) of the Probate Act provides as follows:

> "(b) Upon the filing of a petition by a minor's living, adoptive, or adjudicated parent whose parental rights have not been terminated, the court shall discharge the guardian and terminate the guardianship if the parent establishes, by a preponderance of the evidence, that a material change in the circumstances of the minor or the parent has occurred since the entry of the order appointing the guardian; unless the guardian establishes, by clear and convincing evidence, that termination of the guardianship would not be in the best interests of the minor. In determining the minor's best interests, the court shall consider all relevant factors including:
>
> (1) The interaction and interrelationship of the minor with the parent and members of the parent's household.
>
> (2) The ability of the parent to provide a safe, nurturing environment for the minor.
>
> (3) The relative stability of the parties and the minor.
>
> (4) The minor's adjustment to his or her home, school, and community, including the length of time that the minor has lived with the parent and the guardian.

(5) The nature and extent of visitation between the parent and the minor and the guardian's ability and willingness to facilitate visitation." 755 ILCS 5/11-14.1(b) (West 2022).

¶ 121    Thus, at a hearing on a petition for termination of a guardianship, if the circuit court decides to grant the petition, the court has authority to "discharge the guardian and terminate the guardianship." *Id.* Under section 11-14.1(b), the court does not have authority to order the relocation of the child to another state. In paragraphs D through L of the order of June 5, 2024, which was the "Order Terminating Guardianship," the court specified what was to be done with the child after "Letters of Office are revoked," as paragraph C put it. According to paragraphs D through L, the child was to have a transitional visitation period with the grandfather and then was to be moved to Arizona to live with the mother. Paragraphs D through L were statutorily unauthorized in the proceeding for termination of the guardianship. See *id.* The relief available under section 11-14.1(b) was discharge of the guardian and termination of the guardianship—nothing more. See *id.*

¶ 122    A parent's relocation with a child is a family law matter governed by section 609.2 of the Marriage Act (750 ILCS 5/609.2 (West 2022)), which requires consideration of factors different from, and more numerous than, the factors in section 11-14.(b) of the Probate Act. *Cf. id.* § 609.2(g) with 755 ILCS 5/11-14.1(b)(1) to (5) (West 2022). Relocation would require a modification of the parenting plan and allocation judgment in the family law case. See 750 ILCS 5/609.2(g) (West 2022).

¶ 123    The parenting plan is a contract between the mother and the father (see *In re Marriage of Coulter*, 2012 IL 113474, ¶ 19), a "negotiated agreement," in which "[e]ach party has agreed to certain terms in exchange for other terms" and "terms [are] related to each other"

(*id.* ¶ 31). Not only is the parenting plan a contract, but because of its incorporation into the allocation judgment, it is a court order. Relocating the child to Arizona without following the procedures in the parenting plan and allocation judgment—*i.e.*, the procedures for giving notice to the father and for modifying the parenting plan and allocation judgment—would be a breach of contract and a violation of the judgment in the family law case. The same would be true of unilaterally enrolling the child in a school in Arizona. Educational decision making is supposed to be joint. Having chosen to proceed solely under the Probate Act and having rejected consolidation, Judge Gulley lacked statutory authority to order relocation, "temporary" or otherwise. By ordering relocation without modification of the parenting plan and allocation judgment in the family law case, the circuit court participated in a breach of contract and in a defiance of its own previous judgment.

¶ 124　　　　Judge Gulley reasoned that when terminating the guardianship, she had to order that custody of the child be given to someone—and that because the new custodian was to be the mother, who lived in Arizona, it was necessary to relocate the child to Arizona. At oral arguments, the mother's attorney repeated that reasoning. The mother's attorney then was asked to suppose that, instead of living in Arizona, the mother lived in Taiwan: would terminating the guardianship necessitate an order permitting the relocation of the child to Taiwan? The mother's attorney answered yes. That answer cannot be correct. Apart from the lack of statutory authority that we already have pointed out, the circuit court's reasoning is disproved by the absurd conclusion to which the reasoning logically leads. When the guardianship is terminated, the parenting plan and allocation judgment spring back into force. Under the terms of those binding documents, the mother must exercise her custody rights exclusively in Illinois until the parenting plan is modified through the procedures prescribed therein.

¶ 125                    E. Lack of Notice to the Father in the Guardianship Case

¶ 126        The father complains that, in the guardianship case, "[n]o service of any of the

pleadings, motions, or orders were even attempted on [him]." He notes that "[t]he Amended

Petition to Terminate Guardianship was filed on September 25, 2023, set for trial [15] minutes

later, and set for trial on November 27, 2023, and no service was even attempted upon [him]."

He maintains that he "was entitled to notice of each and every document filed in the guardianship

case."

¶ 127        In July 2021, at the inception of the guardianship case, the grandfather served the

guardianship petition on the father by mail in accordance with section 11-10.1(a) of the Probate

Act (755 ILCS 5/11-10.1(a) (West 2020)). Nevertheless, the father did not appear in the

guardianship case until some three years later. The father informs us in his brief that "[t]he first

time he appeared in the guardianship case was via counsel Brandi Chudoba, on June 5, 2024, for

the purpose of objecting to notice and jurisdiction."

¶ 128        Illinois Supreme Court Rule 104(b) (eff. Jan. 1, 2018) provides:

>    "Pleadings subsequent to the complaint, written motions, and other documents
>    required to be filed shall be filed with the clerk with a certificate of counsel or
>    other proof that the documents have been served on all parties *who have appeared*
>    and have not theretofore been found by the court to be in default for failure to
>    plead." (Emphasis added.)

The "complaint" in the guardianship case was the petition for guardianship. All documents filed

after the petition for guardianship had to be served only on parties who had appeared and had not

been declared to be in default for failure to plead. See *id.* The mother filed her amended petition

for guardianship on September 25, 2023. The father did not appear in the guardianship case until

June 5, 2024. Before his appearance, he was not entitled to be served with documents filed in the guardianship case—including the amended petition for the termination of the guardianship. See *id.*

¶ 129 The moral is this. It is a bad idea to fail to appear in court after being served with a complaint. Being frozen out under Rule 104(b) is one of the resulting disadvantages.

¶ 130 The father still had the right to insist, however, on the notice procedure in the parenting plan and in section 609.2(c) and (d) of the Marriage Act (750 ILCS 5/609.2(c), (d) (West 2022)). One item in the required notice is "the address of the parent's intended new residence." *Id.* § 609.2(d)(2). The record does not appear to contain such a written notice to the father. We see no indication in the record that the guardian *ad litem* has inspected this Meadview residence. See *In re Marriage of Gualandi*, 2024 IL App (5th) 240238, ¶ 87 ("The GAL did not *** inspect the condition of Mother's house."). The father might want to be told, formally, in writing, the address in Meadview where it is proposed that the child will live, if only to confirm for himself that there really is a house at that address and that the house is habitable. We point out this deficiency to show the distance between the notice procedure in this case and the notice procedure to which the father is entitled in the family law case.

¶ 131 F. The Termination of the Guardianship

¶ 132 1. *A Material Change in Circumstances*

¶ 133 a. The Concept of Materiality

¶ 134 At the hearing on a petition for termination of the guardianship, the parent has the initial burden of proof: the parent must prove, "by a preponderance of the evidence, that a material change in the circumstances of the minor or the parent has occurred since the entry of the order appointing the guardian." 755 ILCS 5/11-14.1(b) (West 2022).

¶ 135　　　　　　Which changes in circumstances are "material," that is to say, of real importance? The answer is inferable from the reason for this rule that a change in circumstances must be proven. " 'The logic of this rule is that[,] absent a change in circumstances, a court would be merely ruling on the exact issue previously decided.' " *In re Estate of Andre T.*, 2018 IL App (1st) 172613, ¶ 29 (quoting *In re Wadman's Estate*, 110 Ill. App. 3d 302, 305 (1982)). To avoid putting the court in the position of ruling on the same issue on which the court ruled previously when granting the petition for the appointment of a guardian, the parent must prove that the court's factual justification for establishing the guardianship no longer holds true.

¶ 136　　　　　　For example, in *Wadman's Estate*, 110 Ill. App. 3d at 308, "[t]he original petition on which the agreed guardianship was entered alleged that [the mother] was 'unable to properly care for the minor at [that] time.' " The Fourth District upheld the termination of the guardianship because "at least some showing was made that a change in circumstances existed," specifically, the mother's testimony that "she no longer felt unable to cope with the child" and that "she was no longer working the late night hours as before." *Id.*

¶ 137　　　　　　b. The Resolution of the Mother's Criminal Law Difficulties

¶ 138　　　　　　On July 7, 2021, the circuit court held a hearing on the grandfather's petition to be appointed as the child's guardian. At the hearing, no evidence was presented regarding the mother other than the grandfather's testimony that the allegations in the guardianship petition were true. In his petition, he alleged it would be in the best interests of the child to appoint him as guardian because "the parents dropped [the child] off on June 25[.] [T]hey got in trouble and haven't been back. I need to be able to make decisions and [provide] medical [care] for [the child]."

¶ 139    At the trial on the mother's amended petition to terminate the guardianship, the evidence tended to show that the mother was no longer on the run from the police and that she was now stable and law-abiding. It does not seem unreasonable to characterize such a change as "material" (see *id.* § 11-14.1(b)), considering that the mother's being "in trouble" was important enough to include in the guardianship petition as the reason for the parents' not having "been back."

¶ 140    Two different answers to a question can be within the range of reasonableness, and our standard of review is deferential. The question for us is whether the decision to terminate the guardianship is against the manifest weight of the evidence. See *In re Estate of K.E.S.*, 347 Ill. App. 3d 452, 461 (2004). The supreme court has explained, "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent, or when the findings appear to be unreasonable, arbitrary, or not based on evidence." *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 106 (1995). It was not arbitrary to regard being in trouble with the law as material if the guardianship petition—and presumably, the order granting the petition—regarded that circumstance as material.

¶ 141    According to the grandfather, it is irrelevant that the mother is now crime-free and drug-free. What is unchanged, the grandfather argues, is the mother's "inability to stay in the child's life." It is that circumstance which occasioned the guardianship. The grandfather asserts that, after marrying Filatov, the mother "once again disappeared again for seven (7) months." That assertion is unaccompanied by a citation to the record. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on."). It appears that

for a period of about five months, from November 2023 to April 2024, the mother's only contact with the child was two telephone calls.

¶ 142　　　Nevertheless, the mother petitioned for more parenting time, and after her petition was granted, she and Filatov came to Rockford in a camper so that she could avail herself of the additional parenting time. A reasonable trier of fact could regard those efforts as a substantial improvement over leaving the child with the grandfather, with no guardianship arrangements, and running away to a destination unknown. So, the evidence is not all on one side. It is mixed: there is evidence of intense interest and evidence of insufficient interest.

¶ 143　　　　　　　　　2. *The Best Interests of the Child*

¶ 144　　　Even after the parent proves a material change in circumstances, the proceeding to terminate the guardianship is not necessarily over. Rather, under section 11-14.1(b) of the Probate Act, the burden then shifts to the guardian to prove, by a higher standard of proof— "clear and convincing evidence"—"that termination of the guardianship would not be in the best interests of the minor." 755 ILCS 5/11-14.1(b) (West 2022). In determining the best interests of the minor, the circuit court is to consider a nonexhaustive list of factors, those set forth in subsections (1) to (5) of section 11-14.1(b) (*id.* § 11-14.1(b)(1) to (5)).

¶ 145　　　One of the statutory factors is "[t]he ability of the parent"—that is, the parent petitioning for the termination of the guardianship—"to provide a safe, nurturing environment for the minor." *Id.* § 11-14.1(b)(2). The grandfather argues that the mother's "return to Arizona" and the "subsequent breakdown in the relationship between [the mother and the child] warranted continuation of the guardianship."

¶ 146　　　The circuit court, however, regarded the mother's move to Arizona as positive: as part of the mother's success in "[finding] a new life and *** now [having] something to offer

[the child]." In the court's analysis, the move to Arizona made the factor in section 11-14.1(b)(2) favor the termination of the guardianship. The court said:

> "The Court considered the ability of the parent to provide a safe and nurturing environment. There was testimony from the mother that she *** is living with her husband in Arizona in a three-bedroom home owned by her husband who is a veteran and is employed as a litigation specialist. He testified that he is willing to support [the child] financially and emotionally."

Also, the court cited Filatov's testimony that "Meadview, Arizona, is a safe and wonderful place to raise children" and a statement by an Arizona friend of the mother and Filatov, Ladonna Dose, that "they live in a very supportive community and would help with the care of [the child] if needed."

¶ 147 This finding with respect to the factor in section 11-14.1(b)(2) seemed important to the circuit court's decision. The problem with this finding, though, is its presupposition that the child would be relocated to Arizona upon the termination of the guardianship. Treating relocation as a given was unjustified. At oral arguments, the mother's attorney agreed that we should decide *de novo* whether, in the termination proceedings, the circuit court considered an improper factor. We decide, *de novo*, that the court considered an improper factor: the availability of relocation. The mother's petitions for relocation and for modification of the parenting plan and allocation judgment were still pending—and remain pending, as far as we know. In the family law case, the mother will have "the burden of proving that *** relocation is in the child's best interests" considering the 11 factors in section 609.2(g) (750 ILCS 5/609.2(g) (West 2022)). *Gualandi*, 2024 IL App (5th) 240238, ¶ 77. In addition to considering the factors in section 609.2(g), the circuit court will have to consider the 15 factors in section 602.7(b) (750

ILCS 5/602.7(b) (West 2022)) when deciding whether to modify parenting time. See *Gualandi*, 2024 IL App (5th) 240238, ¶ 78. An investigation by the guardian *ad litem* will have to address the best interests factors. See *id.* ¶ 88. It was impossible to know the outcome of those family law proceedings until the petitions were ruled on.

¶ 148     Because the father "currently [had] active warrants for his arrest since being released from jail," to quote the circuit court, and because he did not join in the mother's request to terminate the guardianship, the grandfather, apparently, was the only party in Illinois who could take care of the child. Whether the relocation of the child to Arizona would be allowed, so that the mother would be able to take care of him, was yet to be determined in the family law case. Therefore, by finding that the grandfather had failed to prove that continuing the guardianship would be in the best interests of the child, the court made a finding that, given the present posture of the family law case, was against the manifest weight of the evidence. See *K.E.S.*, 347 Ill. App. 3d at 461. The finding assumed a fact that was not in evidence: that relocation necessarily would be allowed. Until the petition for relocation was ruled on, that fact was not established.

¶ 149     What remained established, under the unmodified parenting plan and allocation judgment, was the father's right to equal parenting time. The visitation schedule in the parenting plan was still intact. The guardianship merely suspended the parents' rights under the parenting plan and the allocation judgment. With the termination of the guardianship, those rights would spring back into force. Theoretically, then, on any Monday or every other weekend, the father would be able to show up in Arizona and pick up the child, making the child's education impossible. The possibility of such disruption would not be in the best interests of the child.

¶ 150                              III. CONCLUSION

¶ 151  For the foregoing reasons, we reverse the circuit court's judgment and remand this guardianship case with directions to consolidate this case for hearing and disposition into the family law case, Winnebago County case No. 17-F-955, and to hold further proceedings in the family law case that are not inconsistent with this order.

¶ 152  Reversed and remanded with directions.